Melvin C. JONES, Petitioner–
Appellant,

v.

Victor WALKER, Respondent–Appellee

No. 04–13562.

United States Court of Appeals,
Eleventh Circuit.

Aug. 22, 2007.

---

Matthew Dexter Richardson (Court–Appointed), Alston & Bird, LLP, Atlanta, GA, for Jones.

Chad Eric Jacobs, Drew, Eckl & Farnham, LLP, Atlanta, GA, for Walker.

Before BIRCH, CARNES and BRUNETTI,* Circuit Judges.

BRUNETTI, Senior Circuit Judge:

## INTRODUCTION

The appellant, Melvin C. Jones ("Jones"), appeals from a final order of the District Court for Northern District of Georgia denying his petition for a writ of habeas corpus pursuant to the Antiterrorism and Effective Death Penalty Act of 1996 ("AEDPA"). 28 U.S.C. § 2254(d). Jones argues AEDPA has been satisfied and that we should grant him relief based on a trial court's erroneous deprivation of his Sixth Amendment right to counsel. We agree and reverse the order of the district court.

## BACKGROUND

Jones was indicted in DeKalb County, Georgia for felony murder and two counts of cruelty to children. According to the evidence on July 25, 1995, Jones was at home with his three-month-old daughter Jennifer. When no one else was around, Jones took Jennifer into his bedroom and dropped her head-first onto a bed. Later, when Jennifer was heard crying, Jones went into her room to check on her. When he reemerged, Jennifer was dead, having suffered a fatal subdural hematoma. Jones was eventually arrested in connection with the death and during questioning offered the police a full confession. The indictment ensued.

After the indictment, Jones turned his attention to the issue of representation. Right from the start, it was clear that Jones did not possess the means to secure counsel on his own. He was at the time only 21–years–old, almost totally unemployed, and without a regular income. Thus, Jones looked to the DeKalb County Superior Court for assistance, and he was ultimately granted court-appointed counsel. The DeKalb County Public Defender was assigned.

The specific defender appointed to represent Jones was Ms. Claudia Saari. By all measures Ms. Saari was a well-qualified defense attorney. For the previous 8 years she had been employed by the DeKalb County Public Defender's Office. During this time she represented hundreds, if not thousands, of criminal defendants. This included a number of defendants who, like Jones, faced serious felony charges. Thus, as the superior court correctly observed, Ms. Saari was at the time fully capable of providing Jones with an effective defense.

---

* Honorable Melvin Brunetti, United States Senior Circuit Judge for the United States Court of Appeals for the Ninth Circuit, sitting by designation.

Jones, however, did not agree. As soon as he learned of the public defender's appointment Jones dispatched a letter to the court. This letter stated:

Sir, I am a mere 21 years old [sic] and charged with a *capital offense*. The Public Defender's Office does not posses the resources to adequately provide me the type of defense that I need in my case. In addition, the P.D.'s case loads are overburdened. My case requires quite a lot of investigation and interpretation of medical and lab reports. I appeal to you to use your authority and appoint me a private attorney from the panel of attorneys in this case.

The court, however, denied Jones' request and the DeKalb County Public Defender was told to remain involved.

On that note Ms. Saari assumed control of the case and began her representation of Jones. From the beginning she put her vast defense experience to use. Among other things, Ms. Saari filed a number of discovery motions, appeared with Jones to enter a not-guilty plea, and sought to suppress several inculpatory statements made by Jones to the police. In other words, from the moment she entered the case, Ms. Saari made every effort possible to fulfill her duties as Jones' counsel and provide him with a complete and effective defense.

Jones, however, was not satisfied. Less than a month after Ms. Saari took control Jones began filing his own "pro per, special of necessity" motions, arguing Ms. Saari was not putting forth an effective defense. Jones filed: (1) a motion to dismiss the indictment; (2) a motion for the disclosure of similar acts evidence and; (3) a motion to suppress his confession.

Ultimately, after weeks of these "pro per" motions, Jones' discontent reached its peak. On February 5, 1996, he filed a Motion for New Counsel. In his motion Jones stated that Ms. Saari had not: (1) as noted above, filed critical motions, like a dismissal of the indictment; (2) allowed him to address the court prior to entering his plea; (3) transmitted to him "a complete copy of his entire case file" or; (4) communicated to him intended "defensive strategies." As such, he claimed, the assignment of a new, more effective, attorney was surely justified.

On February 16, 1996, the court entered an order addressing the issue of Jones' representation. In its entirety the court's order stated:

Having read and considered Defendant's Motion for New Counsel, it is hereby *ORDERED* that Defendant's Motion is *DENIED*. Although Defendant is entitled to counsel, he is not entitled to counsel of his own choosing. The Court has already informed Defendant of this fact when he previously requested private counsel be appointed. Ms. Claudia Saari of the DeKalb County Public Defender's Office is well-qualified to represent the Defendant, and the Court is satisfied with her representation.

Defendant has [also] submitted several pro se motions to the Court despite the fact that he is represented by counsel. It is hereby *ORDERED* that no motion filed by Mr. Jones pro se shall be considered by the Court while he is represented by counsel. A criminal defendant does not have the right to represent himself and also be represented by an attorney.

And with that, the court considered the issue of Jones' (self) representation to be foreclosed.

Jones, however, did not. Within days Jones resumed filing his own "pro per, special of necessity" motions. This included: (1) a motion for funds to hire investigators and experts; (2) a motion for copies of the grand jury minutes; (3) a demand for an immediate and speedy trial and; (4)

an abatement to the indictment. Again Jones argued these motions were necessary for an effective defense. Thus, it was up to him to file on his own, which he did, each of the motions.

Once the motions were filed, however, Jones did not stop. Instead, as before, Jones punctuated his "pro-per" filings by seeking Ms. Saari's dismissal and the assignment of new counsel. On March 12, 1996, he contacted Ms. Saari by telephone. During the call, Jones repeated to Ms. Saari all of his prior concerns, including: (1) her failure to file crucial motions, like a dismissal of the indictment; (2) her lack of communication and; (3) her refusal to allow him to address the court prior to entering a plea. In all, Jones stated, these concerns justified her removal and the assignment of a new attorney.

On March 14, 1996, a hearing was finally held to address Jones' representation. The hearing was called by Ms. Saari. Both she and Jones attended, and each was given a chance to present their story. Ultimately the court held, as before, there was nothing deficient about Ms. Saari's representation. She had not failed to file any motions, including a dismissal of the indictment, which would have been unwarranted. She had not erred in entering a plea of not-guilty, because Jones had wanted to plead this way. And she had not abused her obligation to communicate. Instead, Ms. Saari was, the court found, providing Jones with "fine" representation.

Given this finding Jones was told he had but two options for counsel. First, Jones was told he could "have [Ms. Saari.]" The court advised Jones to take this option given the "serious charges," the potential for a "life" sentence, his need for "a defense," and Ms. Saari's past success. Second, Jones was told he could "represent [him]self." The court advised Jones this option was his "absolute right," but did not warn him of the dangers and disadvantages associated with choosing it. The below quote typifies exactly what he was told:

> You're going to have either her or represent yourself. So you can make up your mind which one you want to do. She is a fine lawyer. She got a guy out of a death penalty case recently up here. And I am not going to let you dictated to me who your lawyer is. You're entitled to a lawyer, I have furnished you a lawyer, and I have furnished you a fine lawyer, and that's it.
>
> · · ·
>
> . . . It's that simple, and you can figure out what you want to do. If you don't want her to represent you, you're not going to have a lawyer.
>
> · · ·
>
> . . . [I]ts up to [you] if [you] want[ ] to represent [yourself], [you] can represent [yourself]. [You] ha[ve] an absolute right to do that. But [you] do[ ] not have the right to have a lawyer of [your] own choice.

Hearing Transcript March 14, 1996, at 3, 6, 14. And so Jones was firmly and repeatedly told to make his choice: "Ms. Saari" or "self-representation."

Jones' choice, however, was neither. He told the court he would not "have Ms. Saari" because she was in fact "ineffective" and he would not "represent himself" because it would require a "waiver" of his right to counsel. The passage below typifies his clear response:

> Well, I'm not waiving my right to have counsel assist me, and I'm not proceeding pro se. I do not wish to proceed pro se.
>
> · · ·
>
> Your honor, unless you force me to proceed with ineffective assistance, you know, I do not—you know what I'm

saying, I do not wish to proceed with her,—

. . .

I—your honor, I have not asked for a lawyer of my own choice. I just asked for someone who will represent me effectively.

*Id.* at 6, 14. In other words, instead of "Ms. Saari" or "self-representation," Jones' steadfastly repeated that he wanted a new lawyer.

Ultimately, after several heated exchanges, the hearing was simply brought to a close. The court finally determined, despite his clear response, Jones had in fact made a choice regarding his counsel. To the court, Jones' adamant statement that he would not continue with "ineffective" counsel, amounted to a clear expression of his desire not to "have Ms. Saari" and to "proceed pro se." The following dialogue, which marked the hearing's end, is illustrative:

> COURT: . . . Well, that's as far as I can go now. So you still don't want Ms. Saari? . . .
>
> JONES: I'm not waiving my right to have counsel assist me, but I do not want ineffective assistance, and I want the record to reflect that.
>
> COURT: You don't want Ms. Saari? Just tell me that.
>
> JONES: I'm not waiving—I'm not waiving my right to have counsel—counsel assist me.
>
> COURT: Well, you're either going to have her or you're not going to have her, and you're going to make that decision.
>
> JONES: It don't make a difference of the attorney, you know, but I do not want ineffective assistance.
>
> COURT: You don't have ineffective assistance. She's a fine lawyer.
>
> JONES: Your honor, this my—
>
> COURT: Well, I'm tired. I've been wrestling with him for I don't know how long . . . . [Ms. Saari] if he don't want

you, you just don't represent him, that's all there is to it.

. . .

COURT: And draw an order.

*Id.* at 16–17; *see id.* at 10 ("[Mr. Jones] decided this morning that he'd rather represent himself, I gather, than having Ms. Saari to represent him.") So it was, on March 14, 1996, Jones was ordered to proceed as his own counsel.

Once Jones was on his own he wasted no time putting forth a defense. In particular, within weeks of the order, he began offering various filings. These filings, however, were not new, but instead simply requested the court reconsider his old "pro-per" motions, including, but not limited to: (1) his motion to dismiss the indictment; (2) his motion to suppress and; (3) his abatement to the indictment. According to Jones, he was now entitled to have these motions considered in his defense.

Before any motion was considered, however, Jones dispatched another letter to the court. In this letter Jones stated the following:

> I'm writing to let you know that I have talked with Ms. Saari and we have come to an agreement. Your honor I am not totally equipt to defend myself, being unfamilliar [sic] with the rules of evidence. I'm not saying that I agree with every choice she has made in my case, but I do hope she will avoid any further conflict. Because I'm left with no choice I do wish to proceed with Ms. Saari instead of proceeding alone. Your honor with all do respect I do hope that you will allow Ms. Saari to proceed to trial with me.

On May 20, 1996, the court responded to Jones' letter with an order. The full text of the court's order read as follows:

> Having read and considered Defendant's request for Ms. Claudia Saari of the

DeKalb County Public Defender's Office to represent him in the above-captioned matter, it is hereby

*ORDERED* that Ms. Claudia Saari represent Defendant in this case. Ms. Saari previously represented Defendant in this matter until Defendant indicated that he did not want her to represent him. Defendant then proceeded pro se. He has written to the Court requesting Ms. Saari's assistance, which request the Court now grants. It is further *ORDERED* that the case, which was specially set for trial May 18, 1996, is continued until further order of this Court.

And with that, the court once again considered the issue of Jones' (self) representation to be foreclosed.

Like so many times before, however, it did not last. Soon after the court's order, Jones resumed his own "pro-per, special of necessity" filings. This time it was a series of "Notices to the Record." For the most part these "notices" were designed to expose, explain, and condemn Ms. Saari's numerous failures as counsel. This included, but was not limited to, her failure: (1) to seek a dismissal of the indictment; (2) to obtain funds to hire experts and; (3) to pursue the suppression of his confession. Indeed, with so many purported failures, it took Jones nearly two months to file these "notices."

Once they were filed, however, Jones did not rest. Instead, as before, Jones punctuated his "pro-per" filings by yet again seeking Ms. Saari's dismissal and the appointment of new counsel. On August, 7, 1996, he contacted her by telephone. During the call Jones firmly reiterated his earlier concerns, but also articulated new concerns, including that Ms. Saari had not: (1) given him a copy of a key medical report; (2) promised him she would call an independent medical expert to testify or; (3) subpoenaed certain witnesses. Based on the above, Jones declared, it was clear Ms. Saari was not acting in his "best interest," and thus new counsel was needed.

On August 8, 1996, a final hearing was held to address Jones' representation. The hearing was called by Ms. Saari. Once again both she and Jones attended, and each was given a chance to present their story. In the end, the court held Ms. Saari had been acting in Jones' "best interest." She had not given him a copy of the medical report because no copies were available. She had not promised to call the independent medical expert because his testimony would have been harmful. And she had not made any firm decisions regarding witnesses. Instead, the court held, the only person not acting in Jones "best interest" was Jones.

That said Jones was yet again told he had only two options for counsel. First, Jones could "have [Ms. Saari.]" The court reminded Jones that Ms. Saari was a dedicated, experienced, and knowledgeable attorney. Second, Jones could "represent [him]self." The court reminded Jones this was a choice, but did not at the same time warn him of the dangers and disadvantages of this choice. Under the law of the state of Georgia, the court stated, these were the options. The excerpt below fairly and accurately characterizes exactly what Jones was told:

> Well, you're going to do one of two things. You're either going to have her to represent you or you're going to represent yourself. Now, you're going to have to figure out what you're going to do, and you're going to have to decide it today.

> She's an excellent lawyer. I don't know of a better lawyer in this county than Ms. Saari. I've said that umpteen times, and that's the last time I am going to say it to you.

> . . .

[In Georgia,] ... if the defendant does not have a good reason for discharging his court-appointed attorney, the trial court does not err in requiring him to choose between representation by the attorney and proceeding by himself.

And I have haven't heard any good reason [from you] yet.

Hearing Transcript August 8, 1996, at 11, 14. And so Jones was repeatedly and firmly told to make his choice: "Ms. Saari" or "self-representation."

His choice, however, remained neither. Jones told the court he would not "have Ms. Saari" because she refused to act in his "best interest" and he would not "represent himself" because it would require a "waive[r]" of his right to counsel. The following selection typifies Jones' clear response:

Basically, we are having conflicts of interest. Okay. Why should I be required to proceed to trial by myself, if I'm not equipped to handle this trial by myself?

...

[Ms. Saari] is not willing to act to my best interest. If she is not willing to act in my best interest of what I think is best for my case, why should I proceed with her if I'm not comfortable proceeding with her?

...

... [And] I'm not forcing myself to [appear pro se]. And I want the record to reflect that I have not waived my right to have an attorney assist me, an effective attorney ...

...

I want an attorney.

*Id.* at. 13, 14, 16. In other words, Jones yet again firmly told the court he did not want "Ms. Saari" or "self-representation," but instead new counsel.

Ultimately, after several more heated exchanges, the hearing was simply brought to a close. Once more the court deter-mined, despite his clear response, Jones had in fact made a choice regarding his counsel. To the court, Jones' firm statement that he would not proceed with an attorney not acting in his "best interest" amounted to a clear expression of his desire to not "have Ms. Saari" and to "represent himself" The below excerpt, which marked the hearing's end, is exemplary:

JONES: Well, your honor, I'm—I'm only—I'm only asserting my rights. And I know that she is not doing what is in my best interest. And nobody knows that better than me.

COURT: All right. She will gladly accept your firing her. If you want to fire her, just fire her. And you can bring him up here in his street clothes a week from—let's see, a week from Monday. And we'll just let you handle it yourself, because apparently you know more about how to handle it than she does.

JONES: Basically, we are having conflicts of interest. Okay. Why should I be required to proceed to trial myself, if I'm not equipped to handle this trial by myself?

COURT: Well, that's your problem, because you'll either have her or you'll have yourself. Now, I don't know how many times I've told you that.

JONES: Well, I want the record to reflect that the Constitution of the United States, and its applicable to the state[s] through the Fourteenth Amendment, that I do have the right to have effective counsel assist me, and it's her duty to avoid conflicts of interest. But she is not—and I'm having a conflict with her, and I cannot proceed—I cannot proceed with her, and I know that she is not acting in my best interest, and no one can know that better than I.

...

COURT: What conflict of interest does this lady have?

JONES: She is not willing to act to my best interest. If she is not willing to act in my best interest of what I think is best for my case, why should I proceed with her if I'm not comfortable proceeding with her?

COURT: Well, that's your problem about whether you're comfortable or not with her, because she's a fine lawyer and you're going to have her or represent yourself.

JONES: Your honor, would you proceed in a murder trial without an attorney that is acting in your best interest?

COURT: Well, that's up to you. You've got the choice. You've got the choice.

. . .

JONES: Your honor, . . . .

COURT: Do you want her to represent you or not. I'm sick and tired of hearing you go over and over this stuff. There's no way this lady can tell you she can get you off. She'll do the best she can to get you off.

JONES: I have not—I have not asked—I have not, you know, required that she get me off. I'm just requiring that she do what's in my best interest.

. . .

COURT: Well . . . you're going to have her or you're going to represent yourself. Now, that's the last time I'm saying that.

. . .

JONES: . . . I want the record to reflect that I have not waived my right to have an attorney to assist me, an effective attorney . . .

COURT: . . . Do you want this woman to represent you?

JONES: I want an attorney.

COURT: Do you want this woman to represent you?

JONES: I want an effective—

COURT: Do you want this woman to represent you?

JONES: I want an effective attorney.

COURT: Do you want this woman to represent you?

JONES: No, sir.

COURT: All right. [Ms. Saari y]ou are relieved of the case.

. . .

COURT: [Mr. Jones] . . . [y]ou're making a horrible mistake. But that's your business.

*Id.* at 13–17; *see id.* at 16 ("[Mr. Jones, y]ou're the one forcing yourself [to trial pro se].") And so it was, on August 8, 1996, Jones was once again ordered to proceed as his own counsel.

Back on his own Jones immediately started putting forth a defense. He filed motions with the court. He exchanged documents with the prosecution. But mostly he sought a continuance of his trial. As Jones explained, the time between assuming pro se and his trial was just not enough to offer a full defense, as he would not be able to: (1) resubmit key motions; (2) find witness addresses or; (3) prepare for a requested *Jackson–Denno* hearing. Even pro per defendants, Jones stated, were entitled to an "equal and fair right to defend."

A week later Jones received a response. The court told Jones that it would not continue his trial, as under the law of the State of Georgia, a defendant was not permitted to use the discharge of his or her attorney as a means of postponing trial. *Chambers v. State,* 213 Ga.App. 414, 444 S.E.2d 820 (1994). That was exactly what was happening here. Jones had "fired" Ms. Saari "at least twice" (once in March and once in August) without any justifiable basis, and now he was seeking a continuance. It would not be granted, the trial would go forward as scheduled.

Jones' trial began on August 20, 1996. It lasted a total of three days. During the trial Jones picked his own jury, called

witnesses, made objections, moved for a directed verdict, and delivered his own opening and closing statements. But his efforts were to no avail. The jury in Jones' case deliberated for less than one hour, returning a verdict of guilty on all counts. Thereafter the court sentenced Jones to a term of life in prison.

## PROCEDURAL HISTORY.

Once his trial was finished, Jones immediately filed a Motion for New Trial. The court appointed Jones a new attorney to aid him with this motion and a hearing was eventually held. On February 28, 2000, however, the court denied Jones' Motion for New Trial, finding that no error had been committed.

In light of the court's denial, Jones filed a direct appeal with the Georgia Supreme Court enumerating several errors. Among them was the claim he had been denied his Sixth Amendment right to counsel. According to Jones he never waived his counsel, but was ordered to trial pro se. The Georgia Supreme Court, however, did not agree, and on October 10, 2000, it issued the following opinion:

After Jones expressed dissatisfaction with the public defender appointed to represent him, the trial court released her but refused to appoint another attorney. Thereafter, the public defender and Jones reconciled, but Jones again became dissatisfied, and the trial court required that Jones either accept representation by the public defender or represent himself. Jones choose to act as his own attorney, but contends on appeal that he did not validly waive his right to counsel . . . .

Jones denies that he engaged in any dilatory tactics and relies upon the trial court's failure to establish, as suggested by *Raines v. State,* 242 Ga.App. 727, 729, 531 S.E.2d 158 (2000), that he apprehended the nature of the charges, the

range of allowable punishments, potential defenses and mitigating circumstances, and any possible lesser included offenses such as voluntary or involuntary manslaughter. However, this Court has held that it is not incumbent upon the trial court to make each of these inquiries. "The record need only reflect that the accused was made aware of the dangers of self-representation and nevertheless made a knowing and intelligent waiver. Cits" *Wayne v. State,* 269 Ga. 36, 38, 495 S.E.2d 34 (1998). The trial court was authorized find that Jones set forth no justifiable basis for dissatisfaction with the public defender and, therefore, that he "was attempting to use the discharge and appointment of other counsel as a dilatory tactic, which was 'the functional equivalent of a knowing and voluntary waiver of appointed counsel.'" *Bryant v. State,* 268 Ga. 616, 617, 491 S.E.2d 320 (1997). See also *Hobson v. State,* 266 Ga. 638, 469 S.E.2d 188 (1996). "The essential aim of the Sixth Amendment is to guarantee effective assistance of counsel, not to guarantee a defendant preferred counsel or counsel with whom a 'meaningful relationship' can be established. Cits." *Battle v. State,* 234 Ga.App. 143, 144, 505 S.E.2d 573 (1998). Furthermore, the public defender testified that she made Jones fully aware of the nature of the charge, the possible sentences, and the dangers of self-representation. According to Jones' own testimony, he completely understood that, if he rejected appointed counsel, he would have to represent himself. The trial court endeavored to convince Jones to accept the public defender, informing him and his mother about the right to counsel and the qualifications of the public defender. Under all the circumstances, we conclude that Jones knowingly and intelligently waived his right to counsel after

he was made aware of the dangers of self-representation. *Simpson v. State,* 238 Ga.App. 109, 111–12, 517 S.E.2d 830 (1999).

*Jones v. State,* 272 Ga. 884, 536 S.E.2d 511, 513 (2000) (parallel citations omitted).

Following this decision Jones moved on to state habeas relief. The results were the same. The state trial court determined that Jones had not raised a single issue meriting post-conviction relief. And the Supreme Court of Georgia affirmed this determination without an opinion.

That left Jones with federal habeas relief, and on February 28, 2003, he filed a habeas petition. Again Jones alleged a denial of his Sixth Amendment right to counsel. The magistrate judge, however, recommended denying relief, finding he had not satisfied AEDPA. Jones had not shown the Georgia Supreme Court's decision: (1) was contrary to, or involved an unreasonable application of, established federal law or (2) was based on an unreasonable determination of the facts. 28 U.S.C. § 2254(d). Thus relief was not warranted. On June 8, 2003, the district court issued an order agreeing AEDPA had not been satisfied. The relevant portions of the order are as follows:

> [T]he finding[s] of fact[ ] ... by the Georgia Supreme Court, [are] [(1)] that when Petitioner asked for a second time to dismiss appointed counsel and for a continuance of the trial date, the trial court informed Petitioner that he must either proceed with appointed counsel or represent himself[; (2) that] Petitioner insisted he did not want to retain the appointed counsel as his lawyer and elected to proceed *pro se*[; (3) that] Petitioner testified as to his understanding that rejecting appointed counsel necessarily meant self-representation [and; (4) that] ... Petitioner chose to dispense with appointed counsel after the trial court and his own attorney attempted to

convince Petitioner of the public defenders's qualification and the difficulties of conducting a successful defense trial pro se .... Petitioner has not brought forward clear and convincing evidence challenging these findings of fact ... [and has] not shown a violation [of] ... § 2254(d)(2).

> [Further,] ... [w]hile Petitioner alleged that the trial court was required to make a number of findings on the record ... under *Brookhart v. Janis,* 384 U.S. 1, 4, 86 S.Ct. 1245, 16 L.Ed.2d 314 (1966), the Georgia Supreme Court dismissed Petitioner's allegation that the trial court was required to do anything more than ensure that Petitioner was made aware of the dangers of self-representation and made a knowing and intelligent waiver of his right to assistance of counsel. This contention is not contrary to federal law as established by the U.S. Supreme Court. [§ 2254(d)(1).] *Brookhart v. Janis* does not require trial courts to state [anything] for the record ... in a formulaic fashion ...; instead, courts are rightly instructed to take special care to ensure that any waiver of a constitutionally guaranteed right is intentional. 384 U.S. at 4, 86 S.Ct. 1245 .... The court thus finds that the state supreme court's application of state law was not contrary to clearly established federal law.

> Additionally, the state supreme court held that the required knowing an intelligent waiver of the right to counsel could be imputed to a defendant who was attempting to use the discharge of counsel as a delaying tactic .... While criminal defendants are entitled to counsel under the Sixth Amendment, criminal defendants are not entitled to appointed counsel of their choosing. *Wheat v. U.S.,* 486 U.S. 153, 159, 108 S.Ct. 1692, 100 L.Ed.2d 140 (1988). Thus, the state court did not act con-

trary to federal law in denying Petitioner his choice of appointed counsel. [§ 2254(d)(1).] Moreover, the court finds that this implied waiver of the right to counsel is not contrary to clearly established federal law. The Supreme Court has recognized that criminal defendants can forfeit constitutional rights, even Sixth Amendment rights, by virtue of their actions. *See, e.g., Illinois v. Allen,* 397 U.S. 337, 90 S.Ct. 1057, 25 L.Ed.2d 353 (1970). . . .

And on that note Jones pursued an appeal to this court. On July 14, 2005, Jones filed a request for a Certificate of Appealability ("COA"). § 2253(c)(1)(A). The district court refused to grant Jones a COA, and his request was then transferred to this court. On March 14, 2005 we granted Jones a COA and the instant appeal ensued.

### DISCUSSION

### I.

Our review of the instant habeas petition challenging a state conviction is governed by AEDPA. 28 U.S.C. § 2254. Under AEDPA the role of the federal courts is strictly limited. No longer do we have plenary authority to grant habeas relief. *See Gore v. Sec'y for the Dep't of Corr.,* 492 F.3d 1273, 1292 (11th Cir.2007). On the contrary, our authority to grant relief is now conditioned on giving deference to the states. *Marquard v. Sec'y for the Dept. of Corr.,* 429 F.3d 1278, 1303 (11th Cir.2005). Specifically, AEDPA provides that a federal court may not:

> grant a writ of habeas corpus . . . [unless:] *1)* the state decision was "contrary to, or involved an unreasonable application of, clearly established Federal law, as determined by the Supreme Court of the United States," [§ 2254(d)(1)] or *2)* the state decision was "based on an unreasonable determination of the facts in

light of the evidence presented in the State court proceeding." [§ 2254(d)(2)] *Grossman v. McDonough,* 466 F.3d 1325, 1335 (11th Cir.2006) (quoting 28 U.S.C. § 2254(d)(1), (2)) (emphasis added).

Most relevant to the instant habeas petition is AEDPA's treatment of state fact finding. § 2254(d)(2). As noted above, habeas relief may be granted under AEDPA if the state decision was based on an "unreasonable determination" of the facts. *Id.* That, however, is not all. AEDPA's "unreasonable determination" standard must be met by clear and convincing evidence. § 2254(e)(1). Only then may the presumption of correctness afforded state fact finding be overcome. *Id.* The Supreme Court described AEDPA's treatment of state fact finding as follows:

> Factual determinations by state courts are presumed correct absent clear and convincing evidence to the contrary, § 2254(e)(1), and a decision adjudicated on the merits in a state court and based on a factual determination will not be overturned on factual grounds unless objectively unreasonable in light of the evidence presented in the state court proceeding, § 2254(d)(2); see also *Williams* [*v. Taylor,*] 529 U.S. [362,] 399, 120 S.Ct. 1495, 146 L.Ed.2d 389 [(2000)] (opinion of O'CONNOR, J.).
>
> . . . [This] deference does not[, however,] imply abandonment or abdication of judicial review. Deference does not by definition preclude relief. A federal court can disagree with a state court[ ] . . . and, when guided by AEDPA, conclude the decision was unreasonable . . . [because] the factual premise was incorrect by clear and convincing evidence.
>
> *Miller–El v. Cockrell,* 537 U.S. 322, 340, 123 S.Ct. 1029, 154 L.Ed.2d 931 (2003).

■ Applying these principles to the instant petition we find AEDPA, and in particular § 2254(d)(2), has been satisfied.

Jones has shown, clearly and convincingly, the Georgia Supreme Court's decision contains an "unreasonable determination" of fact. § 2254(d)(2). That fact concerns testimony given by Ms. Saari. In its opinion the Supreme Court of Georgia found—indeed based its decision on—the finding that Ms. Saari:

> testified she made Jones fully aware of the nature of the charge, the possible sentences, and the dangers of self representation.

*Jones v. State*, 272 Ga. 884, 536 S.E.2d 511, 513 (2000) (emphasis added); *see id.* ("[W]e conclude that Jones knowingly and intelligently waived his right to counsel after *he was made aware of the dangers of self-representation.*") (emphasis added).

As AEDPA requires we have reviewed all the "evidence presented in the state court proceeding" to determine the reasonableness of this fact. § 2254(d)(2).

First, we evaluated the February 9, 2000, hearing transcript from Jones' Motion for New Trial. Ms. Saari testified at this hearing. During her testimony Ms. Saari stated she made Jones aware: (1) of "the possible penalties;" (2) that he was facing "a serious, serious charge" and (3) that "his options" were to "go forward with [her] or go forward with himself." Motion for New Trial Transcript, February 9, 2000, at 26, 33–34. That, however, is all Ms. Saari testified to. As to what else she might have "made Jones aware of," Ms. Saari stated she "did not remember exactly what transpired;" *i.e.* she had no recollection of the "specifics." *See id.* at 27, 33–34, 37, 41–42. Instead, Ms. Saari testified that reference should be made to the "record" for "details." *Id.*

Second, that led us to evaluate the two hearings held by the trial court which resulted in Jones proceeding to trail without counsel and by self-representation.

We evaluated the transcript from the March 14, 1996, hearing. At this hearing Ms. Saari offered testimony focusing exclusively on what she told Jones during their March 12, 1996, telephone call. Ms. Saari testified during the call she made Jones aware: (1) that he could either "represent himself" or "[have her] as his attorney" and; (2) that she was "not going to file [an indictment] motion" because "[she] d[id] not believe there [was] a legal basis for it." Hearing Transcript, March 14, 1996, at 2, 12. As before, however, this is all Ms. Saari testified to. There is no additional testimony concerning what she "made Jones aware of." Specifically, there is no testimony from Ms. Saari (nor from the court) indicating Jones was "made aware of the dangers of self-representation."

We examined the transcript from the August 8, 1996 hearing. Again, Ms. Saari offered testimony focusing entirely on what she told Jones during their August 7, 1996, telephone call. Ms. Saari testified that during the call she made Jones aware: (1) "of what the [medical examiner] indicated;" (2) that she had not "decided ... whether or not ... to follow through with ... [the] suppression;" (3) that she had not "made any final decision[s] as to whether or not to call" certain witnesses; (4) that "he need[ed] to make up his mind if he want[ed] her] to represent him" and; (5) that *her* "decisions" were "what sort of motions to file" and "the trial of the case," and *his* "decisions" were "plead[ing] guilty or not guilty," whether to have a "jury trial," and "testify[ing.]" Hearing Transcript, August 8, 1996, at 2, 3, 12. Beyond this Ms. Saari gave no other testimony as to what she "made Jones aware of." Again, specifically, there was no testimony by Ms. Saari (nor by the court) indicating Jones was ever "made aware of the dangers of self-representation."

It is based on this clear and convincing evidence that we find the Georgia Supreme

Court's factual finding regarding Ms. Saari's testimony unreasonable. § 2254(d)(2), (e)(1); *see Jones,* 536 S.E.2d at 513 ("[Ms. Saari] testified that she made Jones fully aware of the nature of the charge, the possible sentences, and the dangers of self-representation.")

On the one hand our review indicates it was *reasonable* for the Georgia Supreme Court to find that Ms. Saari "testified" she made Jones fully aware of "the nature of the charge," and "the possible sentences." *Id.* Evidence to support these findings comes from the February 9, 2000, hearing on the Motion for New Trial. At this hearing Ms. Saari did in fact testify to telling Jones "what the possible penalties" were and that he was facing "a serious, serious charge."

On the other hand our review also indicates it was *unreasonable* for the Georgia Supreme Court to find that Ms. Saari "testified" she made Jones "fully aware" of "the dangers of self-representation." *Id.* Evidence to support this finding simply cannot be found in the transcripts of the February 9, 2000, Motion for New Trial, the March 14th Representation Hearing, or the August 8th Representation Hearing. At these hearings Ms. Saari did in fact testify to making Jones aware of a number of things, *e.g.* his choice to "go forward with [her]" or "go forward with himself," but none of them concerned "the dangers of self-representation." As a matter of fact, the record shows that no one, including Ms. Saari or the court, ever made Jones aware of the danger of self-representation. Accordingly, as stated above, we hold that AEDPA has been satisfied. Jones has shown "clearly and convincingly" that the Georgia Supreme Court's decision was "based on an unreasonable determination of the facts in light of the evidence presented in the State court." § 2254(d)(2), (e)(1); *see also Bui*

*v. Haley,* 321 F.3d 1304, 1314–18 (11th Cir.2003) (finding § 2254(d)(2) satisfied).

## II.

Having satisfied AEDPA, and § 2254(d)(2), we must now reconsider how we are to review Jones' federal habeas petition. For the answer we look to the Supreme Court, who last term addressed this issue. According to the Court, in *Panetti v. Quarterman,* —— U.S. ——, 127 S.Ct. 2842, 2858, 168 L.Ed.2d 662 (2007), once AEDPA is satisfied:

> A federal court must then resolve the [petitioner's constitutional] claim without the deference AEDPA otherwise requires.
>
> . . .
>
> [In other words, the court] must consider [the] petitioner's [constitutional] claim on the merits and without deferring to the state court's finding[s]. . . .

## III.

According to the COA in this case we are presented with only a single issue for decision. *Grossman,* 466 F.3d at 1335 (" '[A]ppellate review is limited to the issue specified in the COA.' "). That issue is limited to whether Jones:

> "clearly and unequivocally" asserted his desire to represent himself, thus waiving his [Sixth Amendment] right to counsel, and if so, whether the waiver was knowing and voluntary.

In this circuit, the rules governing a defendant's invocation of his Sixth Amendment right to self-representation, and waiver of his correlative Sixth Amendment right to counsel, are well-established. *Marshall v. Dugger,* 925 F.2d 374, 376–77 (11th Cir.1991); *see Stano v. Dugger,* 921 F.2d 1125, 1143 (11th Cir.1991) (en banc). We have described them as follows:

[A] criminal defendant has both a constitutional right to representation by counsel and a constitutional right to self-representation. To accommodate both of these rights simultaneously, this court has held that the right to counsel "is preeminent over the right to self-representation because the former attaches automatically and must be waived affirmatively to be lost, while the latter does 'not attach unless and until it is *asserted.*'" *Stano v. Dugger*, 921 F.2d 1125, 1143 (11th Cir.1991) (en banc) (quoting *Dorman v. Wainwright*, 798 F.2d 1358 1366 (11th Cir.1986.)). Waiver of the right to counsel and invocation of the correlative right to self-representation is no simple matter, however. *Two requirements must be met. First, the defendant must "clearly and unequivocally" assert his desire to represent himself thus waiving his right to counsel. Second, the court must determine that the defendant has made this election "knowingly and intelligently."*

*Marshall*, 925 F.2d at 376–77 (emphasis added).

The preeminent application of these Sixth Amendment rules came in *Marshall v. Dugger. Id.* at 375. There a criminal defendant was assigned an assistant public defender to assist with his defense. *Id.* After the jury was selected, however, the defendant indicated he wished to discharge his counsel and have new counsel appointed. *Id.* at 375–76. According to the defendant, he was "dissatisfied" with the representation he was receiving. *Id.* at 375. After some consideration, the trial court denied the defendant's request. *Id.* at 376. The trial court found the appointed attorney was more than "qualified" to serve, and that there was no "good cause" to appoint new counsel. *Id.*

At that point, the court directly engaged the defendant regarding counsel. *Id.* The defendant was told he had three options:

(1) he "could continue" with his then counsel; (2) "he could proceed pro se;" or (3) he could continue "with the aid" of "standby counsel." *Id.* Rather than choose any of these options, however, the defendant "simply repeated his opinion that [his counsel] was unqualified." *Id.* The following excerpt "fairly characterizes" exactly what transpired:

> COURT: So, do you want to have [court-appointed counsel] represent you or do you want to represent yourself?
>
> DEFENDANT: Well, I'd like to say, Your honor, I don't feel that [court-appointed counsel] is qualified to represent my case.
>
> . . . .
>
> PROSECUTOR: You still want to proceed on your own behalf without any advice from an attorney . . . ?
>
> DEFENDANT: I would love to have any attorney but—
>
> PROSECUTOR: That is not the—
>
> DEFENDANT: But I don't want [court-appointed counsel].
>
> PROSECUTOR: The question is whether or not you want to proceed without the services of [court-appointed counsel].
>
> DEFENDANT: I don't feel as though [court-appointed counsel] is qualified to handle my case.
>
> PROSECUTOR: Okay. Then I assume your answer is yes, you don't want [court-appointed counsel] advising you in any respect; is that correct?
>
> DEFENDANT: Right.

*Id.* In the end, it was based on this exchange that the court simply "assume[d]" the defendant had in fact elected to waive his counsel and "proceed pro se." *Id.*

On appeal we held that the trial court had erred. *Id.* at 377. Looking at the two "requirements" mentioned above, we found at least one was not met. *Id.* Here

the defendant had not "clearly and unequivocally" asserted his "desire" to "waive counsel" and "represent himself." *Id.* In response to the court's options, all the defendant did was "repeat[ ] his opinion" that his counsel was "unqualified." *Id.* At best, such a response amounted to another baseless rejection of his court-appointed attorney. *Id.* But under no circumstances, we stated, did such an unreasonable rejection equate with an "affirmative[ ]" request to "proceed pro se." and waive counsel. *Id.* Contra *id.* at 378 (Cox J., dissenting) (citing *United States v. Moore,* 706 F.2d 538, 540 (5th Cir.1983) ("a persistent, unreasonable demand for dismissal of counsel and appointment of new counsel ... is the functional equivalent of a knowing and voluntary waiver of counsel.")). As ·such, because both "requirements" were not met, we held the trial court erred in "assum[ing]" a waiver, and denied the defendant his Sixth Amendment right to counsel by "forcing" him to proceed pro se. *Id.*

■ After careful consideration we find this case falls squarely within *Marshall.* The facts are remarkably similar. At his request Jones was given an assistant public defender to assist with his defense. Eventually, however, he became "dissatisfied" with his attorney and made numerous attempts to have her dismissed and new counsel appointed. *Marshall,* 925 F.2d at 375–76. According to Jones, he was displeased with the representation he was receiving. To address Jones' concerns, the trial court held two hearings. At both hearings the court informed Jones that Ms. Saari was providing him with "fine" representation. As such, his numerous requests to have her dismissed (and new counsel appointed) were denied.

At that point the trial court engaged Jones directly regarding counsel. During both hearings Jones was told he had two options: (1) he could "have [Ms. Saari.]" or (2) he could "represent [him]self." Rather than choosing either, however, Jones simply repeated his opinion that Ms. Saari was "ineffective," not acting in his "best interest," and thus new counsel was needed. In fact, Jones repeatedly declared he did "not wish to proceed pro se" or "waive[ ]" counsel. We again repeat the critical dialogue from the August 8, 1996, hearing which accurately depicts what transpired:

> COURT: Well ... you're going to have her or you're going to represent yourself. Now, that's the last time I'm saying that.
>
> . . .
>
> JONES: ... I want the record to reflect that I have not waived my right to have an attorney to assist me, an effective attorney ...
>
> COURT: ... Do you want this woman to represent you?
>
> JONES: I want an attorney.
>
> COURT: Do you want this woman to represent you?
>
> JONES: I want an effective—
>
> COURT: Do you want this woman to represent you?
>
> JONES: I want an effective attorney.
>
> COURT: Do you want this woman to represent you?
>
> JONES: No, sir.
>
> COURT: All right. [Ms. Saari] you are relieved of the case.
>
> . . .
>
> COURT: ... [Mr. Jones] [y]ou're making a horrible mistake. But that's your business.

Hearing Transcript, August 8, 1996, at 16–17. Ultimately, it was exchanges like this which led the trial court to determine that Jones had "decided" to "represent himself," and release Ms. Saari.

As in *Marshall* we find the trial court here erred. At least one of the two estab-

lished "requirements" was not been met. Specifically, Jones did not "clearly and un-equivocally" assert his desire to waive counsel and proceed pro se.[1] *Marshall*, 925 F.2d at 375–77.[2] In response to the court's options, Jones simply repeated his opinion that Ms. Saari was "ineffective" and not acting in his "best interest." At most, this response amounted to another baseless rejection of Ms. Saari. But, as we suggested in *Marshall*, such a rejection does not "equate" to a "clear" and "un-equivocal" request to proceed pro se and waive counsel. *See Marshall*, 925 F.2d at 377–78. In fact we note Jones repeatedly stated exactly the opposite. Jones insisted, time and time again, that he "did not wish to proceed pro se" or "waive[ ]" counsel. As such, because both "requirements" were not met, the trial court erred in determining a waiver, and denied Jones his Sixth Amendment right to counsel by ordering him to proceed pro se.

## CONCLUSION

We REVERSE the judgment of the district court and instruct it to issue a writ of habeas corpus to the appellant, Melvin C. Jones, subject to the right of the state of Georgia to retry the appellant within a reasonable time and in a manner consistent with this opinion.

---

1. "Because we find that ... [Jones] did not 'clearly and unequivocally invoke his right to self-representation, we need not consider whether such an election would have been knowing and intelligent.'" *Marshall*, 925 F.2d at 377; *see also id.* at 377 n. 1 ("While we do not formally reach the issue, we note that we would find the evidence insufficient to support the contention that Marshall's waiver was knowing and intelligent.").

2. We recognize that another recent decision from this circuit, *United States v. Garey*, 483 F.3d 1159 (11th Cir.2007), *en banc granted*, No. 05–14631, 2007 WL 2377329 (11th Cir. Aug. 14, 2007), reached the same conclusion in a similar factual situation. However, because *Garey* was recently called en banc, and has therefore been vacated, we do not rely on it to any extent. *See United States v. Sigma Intern., Inc.*, 300 F.3d 1278, 1280 (11th Cir. 2002).