[PUBLISH]

IN THE UNITED STATES COURT OF APPEALS

FOR THE ELEVENTH CIRCUIT

_____

No. 04-13562

_____

FILED
U.S. COURT OF APPEALS
ELEVENTH CIRCUIT
Aug. 20, 2008
THOMAS K. KAHN
CLERK

D. C. Docket No. 03-00562-CV-JOF-1

MELVIN C. JONES,

Petitioner-Appellant,

versus

VICTOR WALKER,

Respondent-Appellee.

_____

Appeal from the United States District Court
for the Northern District of Georgia

_____

**(August 20, 2008)**

Before EDMONDSON, Chief Judge, and TJOFLAT, ANDERSON, BIRCH,
DUBINA, BLACK, CARNES, BARKETT, HULL, MARCUS, WILSON and
PRYOR, Circuit Judges.

BLACK, Circuit Judge:

In August 1996, Petitioner-Appellant Melvin Jones was convicted in Georgia state court of felony murder and cruelty to a child, in connection with the death of his infant daughter. On February 28, 2003, Jones filed a petition for a writ of habeas corpus under 28 U.S.C. § 2254, contending he was forced to represent himself at trial in violation of his Sixth Amendment right to counsel. The district court denied the petition, but a panel of this Court reversed. We granted en banc review to determine whether Jones validly waived his right to counsel.

Reviewing Jones' claim *de novo*, we conclude Jones voluntarily waived his right to counsel. Moreover, because he failed to meet his burden of proving the waiver was unknowing, we conclude Jones is not entitled to habeas relief. Therefore, we affirm the judgment of the district court.

I.

On July 25, 1995, Melvin Jones' three-month-old daughter, Jennifer Andrews, died while in her father's care. An autopsy revealed her death was caused by a subdural hematoma, resulting from blunt force trauma to her head and face.

Several months later, Jones was indicted for felony murder and cruelty to a child, and experienced public defender Claudia Saari was appointed to represent him. Trial was set for March 25, 1996.

*A. Jones Rejects Assigned Counsel for the First Time*

From the beginning, Jones took issue with Saari's management of his case, and on February 8, 1996, he moved for new counsel. In a written order, the trial court denied the motion without hearing, explaining:

> Although Defendant is entitled to counsel, he is not entitled to counsel of his own choosing. The Court has already informed Defendant of this fact when he previously requested private counsel be appointed. Ms. Claudia Saari of the DeKalb County Public Defendant's Office is well-qualified to represent the Defendant, and the Court is satisfied with her representation.

One month later, Saari requested a hearing to address the question of representation; on March 14, 1996, a hearing was convened. When Saari explained that Jones was expressing dissatisfaction with her representation, the court turned to Jones and stated simply: "[I]t's your call. She's either your lawyer or you don't have one."

Not satisfied with the court's response, Jones argued:

Jones:     Your Honor, it seems to me that under the Constitution it guarantees me the right to have a sufficiency of counsel all through the proceedings. I'm not waiving this right to

3

have counsel assist me.  I just do not want her because she's ineffective assistance.

I am not proceeding for myself.  I do wish to have counsel assist me throughout—

Court:     You're going to have either her or represent yourself.  So you can make up your mind which one you want to do.  She is a fine lawyer.  She got a guy out of a death penalty case recently up here.  And I am not going to let you dictate to me who your lawyer is.  You're entitled to a lawyer, I have furnished you a lawyer, and I furnished you a fine lawyer, and that's it.

Despite the court's admonition, Jones continued to debate Saari's merits as counsel.

The court was not swayed:

Court:     . . . I'm not going to argue anymore with you.  She is your lawyer, or you don't have a lawyer.  It's that simple.

Jones:     Well, I'd just like the record to reflect that I'm not refusing my—I'm not waiving my right to have counsel assist me—

Court:     All right.  Let the record reflect—

Jones:     —and I am not—

Court:     —that I am going to relieve Ms. Saari, if that's what you want to do.

4

The exchange between the court and Jones continued in this vein, with the court insisting it would not appoint another lawyer, and Jones insisting he was not waiving his right to counsel:

Court:      [Y]ou can figure out what you want to do.  If you don't want her to represent you, you're not going to have a lawyer.

Jones:      Well, I'm not waiving my right to have counsel assist me, and I'm not proceeding *pro se*.  I do not wish to proceed *pro se*.

Court:      She's your lawyer, or you're not going to have a lawyer.  It's that simple.

Jones:      Your Honor, unless you force me to proceed with ineffective assistance, you know, I do not—you know what I'm saying, I do not wish to proceed with her—

Court:      All right.

Jones:      —And I do not wish to proceed *pro se*.

Court:      Well, you'll be *pro se*.  If you don't want her you're going to be *pro se*.

A short time thereafter, Jones' mother arrived in court.  In Jones' presence, the judge spoke to her at length, explaining the situation and asking her to talk to her son about accepting Saari's representation.  The judge emphasized Saari's qualifications, stating:

5

I've appointed him a lawyer. She is a fine lawyer. She's recently tried a death penalty case up here and got the guy out of the death penalty. For some reason he doesn't want her to represent him. And I don't have any choice, I'm required to furnish him a lawyer. I've furnished him a fine lawyer, and apparently he doesn't want her. So he's either going to have her as his lawyer or he'll have to represent himself. I've tried to explain that to him umpteen times, and I cannot get through to him. So he decided this morning that he'd rather represent himself, I gather, than having [sic] Ms. Saari to represent him.

So I thought maybe you might could talk to him or something. If I were charged with a crime myself, I don't know of anybody I'd prefer to have represent me more than Ms. Saari.

The court urged Jones' mother to speak with her son about his decision; however, Jones would have none of it. After renewing his barrage of complaints against Saari, Jones engaged in the following exchange with the court:

Jones:      I'm not waiving my right to have counsel assist me, but I do not want ineffective assistance, and I did want the record to reflect that.

Court:      You don't want Ms. Saari? Just tell me that.

Jones:      I'm not waiving—I'm not waiving my right to have counsel—counsel assist me.

Court:      Well, you're either going to have her or you're not going to have her, and you're going to make that decision.

6

Instead of making his decision, Jones continued providing unresponsive statements critical of his lawyer. When the judge had heard enough, he turned to Saari, stating:

> Well, I'm tired. I've been wrestling with him I don't know how long. I'm going to send—if he don't want you, you just don't represent him, that's all there is to it.

And with that, Saari was discharged.

Trial was rescheduled for May 25, 1996.

*B. Jones' Change of Heart*

On May 13, 1996, Jones had a change of heart, and wrote to the court asking to have Saari reappointed to his case. In his letter, Jones explained:

> I'm writing to let you know that I have talked with Ms. Saari and we have come to an agreement. Your Honor I am not totally equipt [sic] to defend myself, being unfamilliar [sic] with the rules of evidence. I'm not saying that I agree with every choice she has made in my case, but I do hope she will avoid any futher [sic] conflict. Because I'm left no choice I do [sic] wish to proceed with Ms. Saari instead of proceeding alone. Your Honor with all do [sic] respect I do hope that you will allow Ms. Saari to proceed to trial with me.

The court granted the request, Saari was reappointed, and the trial was again rescheduled, this time for August 19, 1996.

From May until August the case proceeded without incident. Then, in early August, Jones again began complaining about the quality of Saari's representation.

7

On August 8, 1996, a second hearing was convened before the district court. At that hearing, Jones challenged Saari's decision not to call as witnesses his nine-year-old cousin and a medical expert whose cause of death determination differed only slightly from the testimony of the Government's expert witness. Saari, in turn, objected to Jones' attempts to dictate trial strategy:

> Mr. Jones had requested that I do certain things, in particular file a motion to suppress his statement [to the police]. . . . I informed him at that time that I would not do anything or suppress anything if I felt that it was going to help his case, and likewise I would not do anything, even if he requested it, that I felt might hurt his case. I explained to him that I will certainly always listen to his opinions, but when it comes down to what sort of motions [sic] file, when it comes down to the trial of this case, that is where my education, my experience come into play, and those are the kind of decisions that I'll be making. His decisions are if he wants to plead guilty or not guilty, if he wants a jury trial, if he wants to testify. Those are all of his rights to make that decision [sic], but anything else I would make the decision on whether or not to file a motion to suppress evidence that I think might help his case.

After exploring Jones' complaints and determining Saari was handling the case responsibly, the judge once again offered Jones two options:

> [Y]ou're going to do one of two things. You're either going to have her to represent you or you're going to represent yourself. Now, you're going to have to figure out what you're going to do, and you're going to have to decide it today.

Jones continued to argue his lawyer was incompetent and had a conflict of interest that prevented her from representing him properly. The exchanges between the trial judge and Jones mirrored those at the March 14 hearing, and reveal the court's mounting frustration with Jones' obstinance:

Jones: Your Honor, would you proceed in a murder trial without an attorney that is acting in your best interest?

Court: Well, that's up to you. You've got the choice. You've got the choice.

Jones: Why are you—

Court: I don't have to argue with this man.

Jones: I'm not arguing.

Court: I don't have to argue with this man.

Jones: Your Honor, I'm not arguing.

Court: Do you want her to represent you or not? I'm sick and tired of hearing you go over and over and over this stuff. There's no way this lady can tell you she can get you off. She'll do the best she can to get you off.

Jones: . . . I have not, you know, required that she get me off. I'm just requiring that she do what's in my best interest.

Court: Well, she's trying to do what's in your best interest.

Jones: How can she know what's in my best interest?

Court:     Because she's a seasoned attorney and she knows what the law is about and how it should be handled in your defense.

           *   *   *   *

           [C]ommon sense says you're going to have her or you're going to represent yourself. Now, that's the last time I'm saying that.

Jones:     So, in other words, I'm being—I'm being forced to trial without an attorney?

Court:     That's up to you. You're the one forcing yourself.

Jones:     Well, I'm not forcing myself. And I want the record to reflect that I have not waived my right to have an attorney to assist me, an effective attorney who will—

Court:     . . . . Do you not want this woman to represent you?

Jones:     I want an attorney.

Court:     Do you want this woman to represent you?

Jones:     I want an effective—

Court:     Do you want this woman to represent you?

Jones:     I want an effective attorney.

Court:     Do you want this woman to represent you?

Jones:     No, sir.

Court:     All right. [To Saari] You are relieved of the case.

. . . . [To Jones] You're making a horrible mistake. But that's your business.

## C. Jones Proceeds to Trial Alone

Almost immediately after his lawyer was discharged, Jones requested another continuance, which the trial court denied. In a written motion filed August 15, 1996, Jones renewed his request for a continuance, asking for more time to subpoena witnesses and "resubmit motions which were abandoned by [his] previous counsel." In his motion, Jones argued that because he lacked "the skills of a licensed attorney," he should be given "additional time to prepare his defense."

In the weeks leading up to trial, Jones filed several more motions requesting, among other things, the disclosure of the criminal records of all proposed Government witnesses, a bar on the admission of "other acts" evidence, and a *Jackson-Denno* hearing on the admissibility of his July 25, 1995 confession.

At Jones' request, the court conducted a pre-trial motion hearing on the admissibility of the Government's "similar transaction evidence" and the admissibility of Jones' confession to police. The challenged evidence was all deemed admissible. (After trial, Jones asserted he lost these challenges because, as a *pro se* litigant, he lacked the "skill and knowledge" necessary to prevail on his

11

claims that the evidence was obtained in violation of his Fourth and Fifth

Amendment rights.)

Trial commenced August 20, 1996, with Jones representing himself. On the

morning of trial, Jones renewed his motion for a continuance:

Jones: Basically, I would like to say that it was, you know, it was not my idea to proceed without counsel. But since I am being forced to proceed without counsel, I am requesting a continuance, Your Honor, so I can prepare for the case. . . . I ain't been given no time to prepare.

\* \* \* \*

Court: I will deny the motion for a continuance. *Chambers versus State*, 213 Georgia Appeals 414, says that a defendant will not be permitted to use the discharge of counsel and employment or appointment of another as a dilatory tactic in postponing or avoiding trial of the issue. This case was set back in May, was it not, Mr. McDaniel?

Prosecutor: Yes, it was.

Court: He fired Ms. Saari in March, as I recall. Then in May, right before trial, he re-hired her. And then right before the trial—so I had to continue it at that time for Ms. Saari. Then we specifically set it for today and he's fired Ms. Saari again. So we will proceed.

Jones participated actively in the three-day trial, examining and cross-

examining witnesses, raising objections, and moving for a "directed verdict" at the

close of the Government's evidence. On August 22, 1996, after less than one hour of deliberation, the jury returned a verdict convicting Jones of all counts charged. Jones was later sentenced to life imprisonment.

*D. Motion for a New Trial*

Following trial, counsel was appointed to assist Jones on appeal. On September 6, 1996, Jones' lawyer moved for a new trial, raising several challenges to Jones' conviction, including claims that Jones was denied his right to counsel in violation of the Sixth Amendment and the Georgia Constitution.[1] On February 9, 2000, almost three years later, the district court convened a hearing on the motion.[2]

At the hearing, Jones' appellate counsel made the following argument:

> To establish the waiver, the Judge must investigate as long and as thoroughly [sic] the circumstances of the case before him demands.
>
> *   *   *   *
>
> The waiver must be made with an apprehension of the nature of the charges, statutory offenses within them, the range of allowable punishments thereunder, possible defenses to the charges and circumstances in mitigation thereof and all other facts essential to a broad understanding of the matter.

---

[1] Under Georgia law, a criminal defendant may file a motion for a new trial before pursuing a direct appeal. *See* O.C.G.A. § 5-6-36; O.C.G.A. 5-6-38(a).

[2] After moving for a new trial on September 6, 1996, Jones' appellate counsel took no further action on Jones' appeal. When Jones brought the still-pending motion to the trial court's attention, the court appointed new appellate counsel and scheduled the February 9, 2000 evidentiary hearing.

13

Counsel argued that because the trial court had failed to apprise Jones of these facts, the waiver was invalid.

In response to counsel's argument, the trial court asked the prosecutor to "get Ms. Saari to come over" to the courtroom to tell him "how many times she [had] told [Jones] what his punishment could be." When Saari arrived in the courtroom a short time later, the trial judge began by questioning her regarding her memory of Jones' case:

| | |
|---|---|
| Court: | Do you happen to remember a gentleman named Mr. Melvin Jones? |
| Saari: | I remember the name, and I remember a little bit about the case. I may not remember all of the details since it was years ago. |
| Court: | For some reason you all went back and forth several times. |
| Saari: | I do remember that, Judge. |
| | * * * * |
| Court: | All I wanted to know is did he understand what his penalty was if he was convicted[?] |
| Saari: | Yes, he certainly did. |
| Court: | That's all I wanted to ask. Did you go over that more than once with him? |

14

Saari: Sure. This was a murder case. And I explained, as I do with all of my murder clients, what the possible penalties are and that it was a life sentence. He certainly understood that this was a serious, serious charge.

After the trial judge finished questioning Saari, Jones' counsel asked Saari about various procedural details of the case. Saari responded that she did not "remember specifics about [Jones'] case and the evidence in the case." When the topic turned to the subject of Jones' waiver of counsel, the following exchange occurred:

Counsel: The issue here this morning was was there a knowing and intelligent waiver on the record of his lawyer.

Saari: You know—and I can't—I don't remember specifically the words that he said. I do know that we went back and forth on this. He very clearly knew what his options were. They were described by the Court. Not only the Court, but I did.

And I even explained it to him that you understand you cannot—you don't have the right to pick and choose who your lawyer is, I know how to do my job, I've got an independent expert review on his case. And he understood exactly what was going to happen.

Counsel: This understanding that he had, were any of these understandings placed on the record?

Saari: You'll have to refer to the record. I do not remember what was placed on the record and what was not on the record.

15

I know that we did have a couple of hearings I thought before the Judge and before the Court. He had an opportunity to talk about why he didn't want me as his lawyer.

And the Judge was talking to him about what would happen if he did not want me as his lawyer. I do remember being in court. I don't know how many times. I remember the March hearing.

After eliciting from Saari a list of the advantages she could have provided Jones had she represented him at trial or served as his standby counsel, Jones' lawyer continued:

Counsel:    [D]id you request that the waiver, if any, of Mr. Jones' right to counsel be placed on the record?

Saari:      I don't recall.

Counsel:    Do you recall if the things you testified to before about Mr. Jones knowing the maximum punishments, issues in mitigation, possible defenses, if that information was placed on the record at the time?

Saari:      We'd have to refer to the record because I do not remember exactly what transpired at those hearings in detail.

Jones' counsel did not ask Saari, and she did not volunteer, any information regarding whether she had spoken with Jones about the dangers of representing

16

himself at trial or whether, from her conversations with him, she had reason to

believe he understood those dangers at the time he waived his right to counsel.

As Jones' lawyer finished questioning Saari, the trial judge commented:

> . . . I tell you I got so exasperated I did everything but get down on my hands and knees and plead with him to let Ms. Saari handle his case.

Jones' counsel agreed with the court's characterization of the atmosphere at the

August 8, 1996 hearing:

| Counsel: | Judge, on the August date going through the transcript it is obvious that everyone involved in that case was exasperated. Everything was tense. You can tell—usually it's a cold transcript, and you can't tell what's going on. |
|---|---|
| | But you can tell by reading the transcript that the tensions were high and that the tempers were flaring, that there was acrimony between the lawyer and the client, between the client and the Court. |
| Court: | There certainly was because he certainly just about wore everybody out around here. |
| Counsel: | And our argument this morning is that unfortunately the side affect [sic] of what was going on that morning [was] that the proper waiver was not placed on the record. |
| Court: | Well, we'll just have to let the appellate Courts decide that. |

After Saari testified, Jones was called to the stand by his own counsel. Jones described his relationship with Saari as a troubled one, and catalogued his complaints regarding her handling of his case. When Jones' lawyer questioned whether Jones had asked for a new lawyer in order to delay his trial, Jones answered: "No, sir. I never asked for another attorney by name. I only asked that I had been [sic] given an attorney different from her. I didn't want Ms. Saari to represent me." During his testimony, Jones was not asked and did not volunteer any information regarding whether Saari had spoken with him before trial about the dangers of self-representation, whether anyone else had discussed the subject with him, or whether he understood the dangers of self-representation at the time he waived his right to counsel.

On cross-examination, the Government pressed Jones regarding his understanding of the law not only before, but during trial:

Gov't:    Mr. Jones, you understood the choice though, if you didn't have Ms. Saari, you had to represent yourself? Didn't you understand that?

Jones:    [No response.]

Gov't:    Is that a yes?

Jones:    Yes.

* * * *

18

Gov't:    [Y]ou felt comfortable that you could handle this case yourself, didn't you?

Jones:    No.

Gov't:    You did an opening, didn't you?

Jones:    It was required to be done.

Gov't:    You cross-examined witnesses, didn't you?

Jones:    It was required to be done.

Gov't:    You made objections, correct?

Jones:    It was required.

          *   *   *   *

Gov't:    And you moved for a mistrial when some evidence came in that you thought shouldn't have come in, didn't you?

Jones:    Yes.

Gov't:    You were handling things, weren't you?

Jones:    The best that I could.

Gov't:    And you never said, Judge, stop, I want Ms. Saari back, did you?

Jones:    No.  Because I wasn't going to accept Ms. Saari back.  I didn't want Ms. Saari back.

Gov't:    I understand.  But you knew what your options were, Ms. Saari or yourself, right?

19

Jones:       Yes.

Jones also admitted to reading "law books" prior to trial.

In an order dated February 25, 2000, the trial judge denied Jones' motion for a new trial, finding Jones had "acknowledged an ongoing dialogue with his appointed counsel about representing himself" and had "acknowledged that he fully understood that if he rejected appointed counsel, he would have to represent himself." *Georgia v. Jones*, Case No. 95CR4769-6, Order Denying Motion for New Trial, at 3 (Ga. Superior Ct. Feb. 25, 2000). The court concluded Jones' attempt to discharge counsel was a dilatory tactic which constituted "the functional equivalent of a knowing and voluntary waiver of appointed counsel" under Georgia law. *Id.* at 3 (quoting *Bryant v. State*, 268 Ga. 616, 617, 491 S.E.2d 320, 322 (1997)).

*E. Direct Appeal*

On direct appeal, Jones continued to assert his Sixth Amendment rights had been violated by his forced self-representation at trial.[3] The Georgia Supreme Court disagreed and affirmed Jones' conviction, explaining:

---

[3] Jones raised several other challenges to his conviction as well, including claims that the court erred when it (1) refused to appoint substitute counsel; (2) failed to instruct the jury on the lesser offenses of felony or misdemeanor involuntary manslaughter; and (3) allowed the introduction of untimely-disclosed similar transaction evidence. Georgia Supreme Court Case No. SOOA1387, Appellant's Brief at 8.

The trial court was authorized to find that Jones set forth no justifiable basis for dissatisfaction with the public defender and, therefore, that he "was attempting to use the discharge and [appointment] of other counsel as a dilatory tactic, which was 'the functional equivalent of a knowing and voluntary waiver of appointed counsel.'" . . . Furthermore, the public defender testified that she made Jones fully aware of the nature of the charge, the possible sentences, and the dangers of self-representation. According to Jones' own testimony, he completely understood that, if he rejected appointed counsel, he would have to represent himself. The trial court endeavored to convince Jones to accept the public defender, informing him and his mother about his right to counsel and the qualifications of the public defender. Under all the circumstances, we conclude that Jones knowingly and intelligently waived his right to counsel after he was made aware of the dangers of self-representation.

*Jones v. State*, 272 Ga. 884, 886, 536 S.E.2d 511, 513 (2000) (internal citations omitted).

## F. State and Federal Habeas Proceedings

After his conviction became final on direct appeal, Jones filed a state habeas petition reasserting his original Sixth Amendment claim and adding to it a claim that his appellate counsel had been ineffective. The petition was denied in October 2001, and the Georgia Supreme Court denied Jones' request for permission to appeal.

Having exhausted his state postconviction remedies, on February 28, 2003, Jones filed a petition for a writ of habeas corpus in the United States District Court for the Northern District of Georgia. In his petition, Jones argued his Sixth

21

Amendment rights had been violated when he was forced to represent himself at trial and when his appellate lawyer failed to adequately research his case during his direct appeal. Finding no clear error of law or fact in the Georgia state courts' resolution of Jones' claims, the district court denied the habeas petition on June 8, 2004.

On appeal, a unanimous panel of this Court reversed and granted the petition, concluding Jones' Sixth Amendment rights had been violated because he had "not 'clearly and unequivocally' assert[ed] his desire to waive counsel and proceed *pro se*." *Jones v. Walker*, 496 F.3d 1216, 1231 (11th Cir. 2007). We granted en banc review to determine whether Jones validly waived his right to counsel and, if not, whether he is entitled to habeas relief under 28 U.S.C. § 2254.

II.

Under the Sixth Amendment, criminal defendants are entitled to the assistance of counsel during all critical stages of the criminal justice process. *Iowa v. Tovar*, 541 U.S. 77, 80-81, 124 S. Ct. 1379, 1383 (2004). Arguably, the most complex of these stages is trial, where advocates question witnesses, introduce evidence, argue to the jury, and make myriad strategic decisions. As a result of the technical skill trial demands, "[i]t is undeniable that in most criminal prosecutions

22

defendants could better defend with counsel's guidance than by their own unskilled efforts." *Faretta v. California*, 422 U.S. 806, 834, 95 S. Ct. 2525, 2540 (1975).

Nevertheless, it is the defendant, and not his lawyer or the State, who bears the personal consequences of conviction. *Id.* at 834, 95 S. Ct. at 2541. "[T]he defendant, therefore, . . . must be free personally to decide whether in his particular case counsel is to his advantage." *Id.* A defendant may waive his right to counsel and represent himself so long as his choice to do so is made voluntarily and knowingly,[4] with "a full awareness of both the nature of the right being abandoned and the consequences of the decision to abandon it." *Patterson v. Illinois*, 487 U.S. 285, 292, 108 S. Ct. 2389, 2395 (1988) (quoting *Moran v. Burbine*, 475 U.S. 412, 421, 106 S. Ct. 1135, 1141 (1986)).

In this case, the trial court determined that Jones' repeated rejection of his appointed counsel constituted a "functional waiver" of his right to counsel. Consequently, the court discharged counsel, which required Jones to represent

---

[4] Courts have used various verbal formulations to express the standard for the valid waiver of a constitutional right. Cases have required courts to determine whether the waiver was "intelligent and competent," *see Johnson v. Zerbst*, 304 U.S. 458, 468-69, 58 S. Ct. 1019, 1025 (1938), "knowing, voluntary, and intelligent," *Tovar*, 541 U.S. at 88, 124 S. Ct. at 1387, "knowing and intentional," *Brewer v. Williams*, 430 U.S. 387, 434, 97 S. Ct. 1232, 1258 (1977) (White, J., dissenting), and "knowing and voluntary," *see Godinez v. Moran*, 509 U.S. 389, 400, 113 S. Ct. 2680, 2687 (1993). We use the terms "knowing" and "voluntary" with the understanding that, in the context of waiver, "knowing" is synonymous with "intelligent" and "voluntary" is synonymous with "competent" and "intentional."

23

himself during his murder trial. Jones contends that by doing so the trial court violated his Sixth Amendment right to counsel.

This case comes to us as a petition for a writ of habeas corpus under 28 U.S.C. § 2254, and as such, is governed by the Antiterrorism and Effective Death Penalty Act of 1996 (AEDPA). Under AEDPA, a federal court must deny relief to a person in custody pursuant to a state court conviction unless the state court decision adjudicating the petitioner's claim was (1) "contrary to, or involved an unreasonable application of, clearly established Federal law, as determined by the Supreme Court of the United States," *or* (2) was "based on an unreasonable determination of the facts in light of the evidence presented in the State court proceeding." *Id.* § 2254(d)(1)-(2).

Jones cannot meet the requirement of § 2254(d)(1) because the Supreme Court has never confronted a Sixth Amendment challenge involving a defendant who rejects his appointed counsel without good cause. *Cf. United States v. Garey*, — F.3d —, Case No. 05-14631 (11th Cir. August 20, 2008) (en banc) ("The Supreme Court has never confronted a case in which an uncooperative defendant has refused to accept appointed counsel or engage in a colloquy with the court."). However, as the original panel decision in this case discussed thoroughly, *see Jones*, 496 F.3d at 1226-28, Jones has demonstrated the Georgia Supreme Court

24

unreasonably determined the facts of his case. Under AEDPA, we would ordinarily defer to both the state court's legal and factual determinations. *See, e.g.*, *Parker v. Sec'y for Dep't of Corr.*, 331 F.3d 764, 776 (11th Cir. 2003) (discussing deference under § 2254(d)(1)); *Gore v. Sec'y for Dep't of Corr.*, 492 F.3d 1273, 1294 (11th Cir. 2007) (discussing deference under § 2254(d)(2)). Nevertheless, because this is a rare case in which the petitioner has met the requirement of § 2254(d)(2) by showing the state courts made an unreasonable factual determination, we review Jones' claim *de novo*, without deference to the Georgia Supreme Court's decision.[5]

## A. *United States v. Garey*

---

[5] Federal habeas courts generally defer to the factual findings of state courts, presuming the facts to be correct unless they are rebutted by clear and convincing evidence. *Id.* § 2254(e)(1). However, when a state court's adjudication of a habeas claim "result[s] in a decision that [i]s based on an unreasonable determination of the facts in light of the evidence presented in the State court proceeding," *Id.* § 2254(d)(2), this Court is not bound to defer to unreasonably-found facts or to the legal conclusions that flow from them. *See Taylor v. Maddox*, 366 F.3d 992, 1008 (9th Cir. 2004) ("When we determine that state-court fact-finding is unreasonable, . . . we have an obligation to set those findings aside . . . ."); *see also Panetti v. Quarterman*, — U.S. —, 127 S. Ct. 2842, 2858 (2007) (declining to apply AEDPA deference when state court made unreasonable determination of law under 28 U.S.C. § 2254(d)(1)). Although the Georgia Supreme Court found Jones' appointed trial counsel, Claudia Saari, "testified that she made Jones fully aware of the nature of the charge, the possible sentences, and *the dangers of self-representation*," *Jones*, 272 Ga. at 886, 536 S.E.2d at 513 (emphasis added), the record demonstrates Saari never testified about whether she warned Jones of the dangers of self-representation. Because the Georgia Supreme Court unreasonably determined the facts relevant to Jones' Sixth Amendment claim, we do not owe the state court's findings deference under AEDPA. We therefore apply the pre-AEDPA *de novo* standard of review to Jones' habeas claims. *See Johnson v. Alabama*, 256 F.3d 1156, 1169 (11th Cir. 2001) (noting *de novo* standard of review governs pre-AEDPA claims).

In our recent en banc decision in *Garey*, we confronted a similar Sixth Amendment challenge brought by a federal defendant who asserted his right to counsel had been violated by the district court's dismissal of his appointed counsel. Although *Garey* came to us on direct appeal, rather than as a petition for a writ of habeas corpus, the similarities between the defendant's behavior in *Garey* and Jones' behavior are striking, and invite comparison.

The facts in *Garey* were these. After being charged with numerous felony offenses, defendant Eddie Garey was appointed a competent defense attorney. *Id.* at 5. On the eve of trial, however, Garey asked for new counsel, alleging his appointed counsel suffered from a conflict of interest. *Id.* at 5-6. There was no real conflict; therefore, the trial judge denied Garey's request and offered him the same choice given to Jones: proceed with appointed counsel or proceed *pro se*. *Id.* at 6. Garey rejected counsel, but refused to affirmatively invoke his right to self-representation. *Id.* at 7-9. Repeatedly, the trial court explained Garey's options, discussed the penalties Garey would face upon conviction, and elaborated on the benefits of counsel and the "pitfalls" of self-representation. *Id.* Garey continued to reject his court-appointed attorney and, in his words, "involuntarily waive" his right to counsel. *Id.*

The district court interpreted Garey's uncooperative behavior as a voluntary waiver of counsel and discharged Garey's appointed attorney, but required him to remain as standby counsel. *Id.* at 9. At trial, Garey represented himself, and was convicted of 27 felony offenses. *Id.* at 13-14.

On appeal to this Court, Garey argued the district court violated his Sixth Amendment rights by forcing him to represent himself at trial when he had not made an affirmative request to do so—a prerequisite to valid waiver under then-controlling Circuit precedent. In a decision overruling *Marshall v. Dugger*, 925 F.2d 374, 377 (11th Cir. 1991), we recognized for the first time that it is possible for a valid waiver of counsel to occur not only when a cooperative defendant affirmatively invokes his right to self-representation, but also when an uncooperative defendant knowingly rejects the only counsel to which he is constitutionally entitled. *Garey*, at 21. We did not establish a default rule requiring district courts to interpret each instance of uncooperative behavior as a waiver by conduct of the right to counsel; however, we recognized in some instances a defendant's conduct will reveal a voluntary decision to choose the path of self-representation over the continued assistance of counsel. *Id.* at 23.

In the context of the facts then before us, we held the district court had not abused its discretion by interpreting Garey's uncooperative behavior as evidence of

a voluntary choice to waive his right to counsel. *Id.* at 30. The trial court had informed Garey in no uncertain terms that the only attorney to which he was entitled was his appointed counsel. *Id.* at 7. In no less uncertain terms, Garey indicated he did not want his appointed counsel's assistance, questioned his counsel's allegiance, and disagreed with the manner in which his counsel was representing him. *Id.* at 28. Garey had rejected his attorney outright at least four times, and several times more had expressed an "involuntary" intention to represent himself. *Id.* at 30. In light of those facts, we agreed Garey's conduct evinced a voluntary choice to proceed *pro se*. *Id.*

Our inquiry did not end there, however. We emphasized a court may not discharge counsel without violating the defendant's Sixth Amendment rights unless the defendant not only rejects the only counsel to which he is constitutionally entitled, but also understands the choices available to him and the potential dangers of proceeding *pro se*. *Id.* at 21. In Garey's case, we concluded those requirements had been met. The judge who presided over Garey's trial provided ample warnings of the dangers of self-representation, informing the defendant that there were many advantages to being represented by an attorney trained in the law and familiar with the rules of evidence and other rules applicable to his case. *Id.* at 31. The trial court warned of "pitfalls" associated with interrogating, impeaching, and cross-

28

examining witnesses and discussed with Garey the calculus involved in deciding whether to testify at trial. *Id.* In addition, the court explained some of the challenges Garey would face in making his opening statement. *Id.* In light of those facts, we concluded Garey waived his right to counsel knowingly and that his Sixth Amendment rights were not violated by his self-representation at trial. *Id.* at 32.

With that background in mind, we turn now to the facts of the present case.

*1. Voluntary Waiver*

Like Garey, Jones contends his Sixth Amendment rights were violated when the trial court dismissed his appointed counsel and required him to represent himself at trial. It is undisputed Jones never directly asked to represent himself. Quite the opposite, he repeatedly invoked his right to counsel and insisted he wanted an attorney (just not the one appointed to represent him). Jones did not affirmatively waive his right to counsel; therefore, the question becomes whether Jones, like Garey, voluntarily waived his right to counsel not by his words, but by his conduct.

Throughout the course of his criminal proceedings, Jones was informed repeatedly by the trial court and by his lawyer that he was not entitled to counsel of his choice, *see Thomas v. Wainwright*, 767 F.2d 738, 742 (11th Cir. 1985), and that

Saari was the only lawyer who would be appointed to represent him.[6] At the March 14, 1996 waiver hearing, the court explained: "[Saari] is your lawyer, or you don't have a lawyer. It's that simple." And again, at the August 8, 1996 hearing (which took place after Jones had already fired and re-hired Saari once before), the trial court reiterated: "[Y]ou're going to do one of two things. You're either going to have her represent you or you're going to represent yourself."

Jones admits he understood his choice was to accept Saari's representation or proceed without counsel, and given that choice, he rejected Saari's assistance on two separate occasions, once in March 1996 and again in August 1996. At the March 14, 1996 hearing, Jones refused to choose between Saari's representation and self-representation, all the while repeatedly criticizing Saari's management of his case. In response, the trial court dismissed counsel.

When Jones later had second thoughts about the wisdom of proceeding *pro se*, the trial court reappointed Saari. However, it was not long before Jones once again took issue with her representation. At the August 8, 1996 hearing, Jones explicitly rejected Saari's assistance:

Court:     Do you want this woman to represent you?

---

[6] Jones does not challenge the district court's conclusion that there was no good cause for dismissing his appointed counsel.

Jones:     I want an effective—

Court:     Do you want this woman to represent you?

Jones:     I want an effective attorney.

Court:     Do you want this woman to represent you?

Jones:     No, sir.

With respect to their conduct before the trial court, the main difference between Jones and Garey is that Jones' conduct was even less cooperative and more dilatory. Jones' uncooperative behavior spanned a five-month period and resulted in his trial being delayed on three separate occasions—all "aggravating factors" not present in Garey's case. In virtually all other respects, their conduct was nearly identical.

Jones understood he was entitled to only one attorney: Claudia Saari. Nevertheless, Jones rejected Saari's assistance, questioned her "effectiveness," and made it known in open court that he disagreed with the way she was handling his defense. When pressed by the trial court, Jones unequivocally stated he did not want Saari to represent him. In light of those facts, the trial court did not err when it concluded that by rejecting appointed counsel, Jones "voluntarily chose to proceed *pro se* as surely as if he had made an affirmative request to do so," and therefore "voluntarily waived his right to counsel by his conduct." *Garey*, at 30.

*2. Knowing Waiver*

That leaves the question whether, because neither the trial court nor his appointed counsel warned him on the record of the dangers of proceeding *pro se*, Jones' waiver was unknowing. It is on this prong of our analysis that Jones's case begins to diverge from *Garey*.

In *Garey*, the trial court provided the defendant with extensive warnings regarding the dangers of proceeding *pro se*, describing the potential pitfalls of self-representation, "including the questioning of witnesses, the decisions on who to put up as witnesses, the decisions on whether to testify or not, decisions regarding impeachment, cross-examination." *Garey*, at 6. The judge explained the trial would be complex, and provided Garey with examples of the sorts of difficult Fifth Amendment issues that might arise for him as a *pro se* litigant. *Id.* at 11-12. Repeatedly, the trial court urged Garey to accept representation from his appointed counsel, whom the court had retained as standby counsel.

The trial judge did not provide similar warnings in Jones' case. Although the judge praised the virtues of Jones' appointed counsel and asked Jones' mother to persuade her son to accept Saari's representation, the court did not provide Jones with any explanation of the rights he was surrendering by waiving counsel. The trial judge did not advise Jones of the procedural and evidentiary rules he would be

required to follow or inform him he would have to make complicated strategic decisions at trial. When Jones asked questions regarding his right to counsel, the judge insisted appointed counsel Saari was "a fine lawyer" and indicated he "was sick and tired of hearing [Jones] go over and over" his complaints about her. The judge repeatedly asserted he "didn't have to argue" with Jones. The only comments approximating warnings were (1) the court's statement to Jones that Saari was "a seasoned attorney" who "knows what the law is about and how it should be handled in your defense" and (2) the observation, made after Saari was discharged, "You're making a horrible mistake. But that's your business."

On direct appeal, the Government bears the burden of proving a waiver is both voluntary and knowing. *Garey*, at 27. In such cases, the Government must do more than rest on a silent record: it must point to evidence demonstrating the defendant was warned by the court or knew from another reliable source (*e.g.*, his lawyer, the prosecutor, past experience, specialized training, or some other independent source of information) of the dangers that lay ahead. Here, the trial court did not warn Jones of the dangers of self-representation and, contrary to the Georgia Supreme Court's opinion, *see* note 5, *supra*, there is no record support for the proposition that Jones' lawyer testified she counseled him on the dangers of

33

representing himself.  If confronted with this record on direct appeal, we would be unable to say the Government had established Jones' waiver was knowingly made.

But this is not a direct appeal:  it is a petition for a writ of habeas corpus.

*B.  Habeas Corpus*

"When the process of direct review . . . comes to an end, a presumption of finality and legality attaches to [a] conviction and sentence."  *Brecht v. Abrahamson*, 507 U.S. 619, 633, 113 S. Ct. 1710, 1719 (1993) (quoting *Barefoot v. Estelle*, 463 U.S. 880, 887, 103 S. Ct. 3383, 3391-92 (1983)).  For that reason, courts often "appl[y] different standards on habeas than would be applied on direct review."  *Id.* at 634, 113 S. Ct. at 1720.  One such difference is a shift in the burden of proof relating to Sixth Amendment waiver of counsel claims.

On direct appeal, the Government bears the burden of proving a defendant has waived his right to counsel knowingly and voluntarily.  *Garey*, at 27; *United States v. Cash*, 47 F.3d 1083, 1088 (11th Cir. 1995).  But when a defendant "seeks release by the extraordinary remedy of habeas corpus, the burden of proof rests upon him to establish that he did not competently and intelligently waive his constitutional right to assistance of Counsel," *Johnson v. Zerbst*, 304 U.S. 458, 468-69, 58 S. Ct. 1019, 1025 (1938); *see also Ferguson v. Culliver*, 527 F.3d 1144, 1147 (11th Cir. 2008); *Vines v. United States*, 28 F.3d 1123, 1135 (11th Cir. 1994);

*Lindsey v. Smith*, 820 F.2d 1137, 1149 (11th Cir. 1987). A writ of habeas corpus may be issued only if the petitioner "convinces the court by a preponderance of evidence" that he did not validly waive his right to counsel. *Johnson*, 304 U.S. at 469, 58 S. Ct. at 1025. Consequently, it is Jones who bears the burden of proving his waiver was *unknowingly* made.

To meet his burden, Jones was required to point to evidence in the record from which a trier of fact could reasonably conclude Jones did not understand the dangers of self-representation at the time he waived his right to counsel. Although this Court's precedents put Jones on notice of the importance of developing a complete record for his habeas appeal, and although Jones was given ample opportunity to develop his record in state court, he failed as a matter of law to prove he did not understand the dangers of self-representation at the time he waived his right to counsel.

Jones argues the trial court was obliged to warn him of the dangers of self-representation, and because it did not do so, his Sixth Amendment rights were violated. Our precedents establish, however, that failure to provide on-the-record warnings does not always lead to reversal. *See, e.g.*, *Strozier v. Newsome*, 926 F.2d 1100, 1105 (11th Cir. 1991) (*Strozier II*); *United States v. Fant*, 890 F.2d 408, 409 (11th Cir. 1989); *Fitzpatrick*, 800 F.2d at 1065. Though this Court has held time

and again that trial courts should ensure defendants do not waive counsel unless they understand the protections they are surrendering, *see, e.g.*, *Garey*, at 25; *Cash*, 47 F.3d at 1088, it does not follow automatically that Jones' constitutional rights were violated by the court's failure to warn him in this particular case.

The warnings given (or not given) to a criminal defendant are relevant to whether the defendant knowingly waived his right to counsel; however, the failure to provide on-the-record warnings is not conclusive proof that a defendant's waiver of counsel was unknowingly made. We require trial courts to warn defendants of the dangers of self-representation not because the warnings are an end in themselves, but because they are a means to the end of ensuring defendants do not waive fundamental constitutional rights without an adequate understanding of the consequences of their choices. *Cf. Strozier v. Newsome*, 871 F.2d 995, 998 (11th Cir. 1989) (*Strozier I*) (warnings are "a means to the end [of] ensuring a voluntary and intelligent waiver"). Despite our strong admonition that trial courts provide on-the-record warnings to all defendants who wish to waive their right to counsel, the "ultimate test" of whether a defendant's choice is knowing is not the adequacy of the trial court's warning but "the defendant's understanding." *Fitzpatrick*, 800 F.2d at 1065; *see also Stano v. Dugger*, 921 F.2d 1125, 1145 (11th Cir. 1991) (en banc).

So long as a defendant knows the risks associated with self-representation, it is irrelevant for constitutional purposes whether his understanding comes from a colloquy with the trial court, a conversation with his counsel, or his own research or experience. The core inquiry is whether the defendant understood the choices before him and the potential dangers of proceeding *pro se*. If so, his waiver is valid.

At the time Jones waived his right to counsel, the practice of this Circuit was well-established: when reviewing the convictions of state defendants who had waived counsel without prior on-the-record warnings, this Court would scrutinize the record to determine whether it supported a finding that each petitioner had knowingly waived his right to counsel. *See, e.g.*, *Fitzpatrick*, 800 F.2d 1057; *Strozier II*, 926 F.2d 1100. That practice has not changed. In reviewing habeas petitioners' state court records, we examine a variety of facts, including the defendant's background, experience and conduct; his knowledge of the nature of the charges, the possible defenses, and the possible penalties; and whether the defendant was trying to manipulate the events of the trial. *Strozier II*, 926 F.2d at 1105 (citing *Fitzpatrick*, 800 F.2d at 1065-67); *see also Strozier I*, 871 F.2d at 998.

Jones was given a full opportunity to develop the record. Nevertheless, he squandered his best opportunity to adduce evidence on whether his waiver was

37

unknowing. Three years after Jones was convicted, he filed an amended motion for a new trial, contending among other things, that he had not validly waived his right to counsel. The trial court convened an evidentiary hearing on the motion, at which Jones was represented.[7]

At that hearing, counsel argued Jones' waiver was not valid because the trial judge had failed to apprise Jones of "the nature of the charges, statutory offenses within them, the range of allowable punishments thereunder, possible defenses to the charges and circumstances in mitigation thereof and all other facts essential to a broad understanding of the matter." However, Jones' attorney studiously avoided asking questions or eliciting testimony on a critical factual issue: whether Jones knew from Saari or any other source of the dangers of self-representation.

During the evidentiary hearing, the state trial court elicited testimony from Saari regarding Jones' understanding of the seriousness of his offense and the applicable penalties. Jones' counsel did not follow up on this line of questioning by asking Saari whether she had ever discussed with Jones the dangers of self-representation, or by probing whether Saari believed from her conversations with

[7] At the February 9, 2000 evidentiary hearing on Jones' motion for a new trial, the Government bore the burden of proving Jones' waiver was knowing and voluntary. Nevertheless, it was incumbent on Jones to develop the record with an eye not only to his direct appeal, but also to his federal habeas petition. AEDPA requires habeas petitioners to develop the factual basis of their federal claims in state court proceedings, and any petitioner who fails to do so is not entitled to a later hearing in federal court. *See* 28 U.S.C. § 2254(e)(2).

Jones that he possessed an adequate understanding of the dangers of self-representation. More troubling still, when Jones took the stand, he never testified he had been unaware of the dangers he would face as a *pro se* litigant. In response to the Government's questions, Jones admitted he understood his choice was to be represented by Saari or to represent himself. He explained that he had not asked the court to reappoint Saari during the trial "[b]ecause I wasn't going to accept Ms. Saari back. I didn't want Ms. Saari back." In short, despite having had ample opportunity to develop his record, Jones remained silent on the question of what he knew (or did not know) at the time he waived his right to counsel.

Knowing what is not in the record, we turn to what is. At the time of his indictment, Jones was twenty-one years old. His educational background is unclear, though it is apparent from his filings and his statements in open court that he was literate and articulate. His filings and oral statements were coherent and suggest he possessed at least average intelligence. He did not suffer from mental illness.

With respect to Jones' contact with lawyers and his understanding of the case, the record reveals he was represented by Claudia Saari, an experienced attorney, from the time of his indictment in the fall of 1995 to his first dismissal of counsel in March 1996. Saari resumed handling Jones' case in May 1996, at Jones'

request, and remained his lawyer until August 1996, when Jones again rejected her representation. Much of Jones' conflict with Saari centered around his trial defense, including the witnesses to be subpoenaed and the expert testimony to be elicited. His differences of opinion on these topics suggest he possessed at least a rudimentary understanding of the possible defenses to his crime.

Jones and his mother were informed in open court of the seriousness of the murder charges against him and of the possibility he could be sentenced to life imprisonment, and Jones' lawyer testified she had discussed with him the possible penalties for his crime and Jones understood the seriousness of the charges against him. Both Saari and the trial court impressed upon Jones that, as a result of Saari's legal training, she "knew the law and how it should be handled in [his] defense."

The record is more equivocal with respect to Jones' understanding of courtroom rules and procedures. Jones was not questioned about his familiarity with the rules of evidence or with the law governing his case and although he testified that he had read "law books" prior to his trial, he also represented he was "unfamiliar with the rules of evidence."

Jones was, however, aware of the importance of the rules of evidence and the importance of having assistance from an attorney who understood them, as evidenced by his letter requesting Saari's re-appointment in May 1996. Following

trial, Jones wrote that his "lack[] [of] skill and knowledge" had prevented him from prevailing on his attempts to suppress evidence the Government introduced against him at trial. Jones' prior experience with the criminal justice system appears to have been limited to one charge of battery, to which he pleaded guilty and received a sentence of probation. This was his first trial.

We review Jones' performance during trial, not because we wish to determine whether his trial conduct was good or bad, but because his performance at trial provides some circumstantial evidence of what he knew at the time he waived his right to counsel. Jones participated actively in his trial defense. Before trial, he sought a third continuance in order to subpoena witnesses and "resubmit motions which were abandoned by [his] previous counsel." He also filed motions in limine and requested a *Jackson-Denno* hearing and a hearing on the admissibility of "similar transaction evidence" the Government planned to introduce. During trial, Jones examined and cross-examined witnesses, made objections, and moved for a judgment of acquittal at the close of the Government's case. At the hearing on his motion for a new trial, Jones testified he had not asked the court to re-appoint counsel during trial because he "didn't want Ms. Saari back"—a statement that suggests even in the midst of complicated proceedings, Jones preferred self-representation over his only other option.

41

There are several facts in the record which suggest Jones' waiver may not have been made with a full understanding of the dangers of self-representation. Jones was only twenty-one years old at the time he was charged and had minimal past experience with the criminal justice system. He had never before been to trial. He was not assigned standby counsel to assist him at trial, and perhaps most importantly, neither the court nor any other person provided him with on-the-record warnings of the dangers of self-representation.

Nevertheless, there are many facts in the record which suggest Jones' waiver was not unknowing. Jones was not mentally ill, understood the nature of the charges against him, and was aware of the possible penalties he faced upon conviction. *Cf. Fitzpatrick*, 800 F.2d at 1066-67. He had the opportunity to consult with experienced trial counsel and was not pressured into waiving his right to counsel. Jones understood courtroom rules and procedures well enough to participate actively in his defense at trial by moving to suppress evidence, making objections, moving for a judgment of acquittal, and examining and cross-examining witnesses. His understanding of these trial procedures suggests he knew how to "compl[y] with normal court procedure, and that he generally knew how to handle himself in court." *Id.* at 1067. Jones' repeated attempts to continue his trial by dismissing, re-hiring, and re-firing counsel are "[e]vidence of manipulation or

42

intentional delay" which "impl[y] a greater understanding of the proceedings and an understanding of the risks and complexities of a criminal trial." *Id.* And finally, Jones' testimony at the evidentiary hearing on his motion for a new trial fails to show his decision to proceed *pro se* was anything but a calculated, voluntary exercise of his informed free will, *cf. Faretta*, 422 U.S. at 835, 95 S. Ct. at 2541, rather than the result of a mistaken or uniformed decision.

Jones bore the burden of coming forward with some evidence—whether in the form of his own testimony, the testimony of others or documentary evidence—from which a trier of fact could reasonably conclude by a preponderance of the evidence that he did not understand the right he was surrendering and the attendant dangers of proceeding *pro se*, and he failed to meet that burden. At his evidentiary hearing in state court Jones was represented by counsel and took the stand to testify. If at the time of his trial he had lacked an understanding of the dangers of self-representation, all he had to do was testify to that effect at the evidentiary hearing on his motion for a new trial. Instead, Jones remained silent on the question of what he understood at the time he waived counsel, and his attorney at the evidentiary hearing did not question Saari about whether she ever warned Jones off the record of the dangers of proceeding *pro se*.

43

Standing alone, the mere existence of some evidence in the record casting doubt on whether Jones' waiver was knowing is insufficient as a matter of law to prove the waiver was unknowing. Given the record evidence supporting the inference that Jones' waiver was knowing and the dearth of evidence pointing to the opposite conclusion, we conclude Jones has not met his burden of proving by a preponderance of the evidence that his waiver of counsel was made unknowingly. As a result, the district court did not err by denying his petition for habeas corpus.

**AFFIRMED.**

BARKETT, Circuit Judge, Dissenting:

When a defendant such as Melvin Jones objects to appointed counsel but refuses to waive his right to counsel and at the same time refuses to represent himself, the trial judge must navigate between competing constitutional rights.

In such a case, a judge must advise the defendant that he is entitled to effective representation but not to the counsel of his choice, and then to explain the ramifications and dangers both of waiving the right to counsel and of proceeding pro se. After the judge has appropriately advised the defendant and determined that the defendant understands the ramifications of the only available choices, the judge has three options.

First, if the judge determines that the defendant is incapable of representing himself, the judge should order the defendant to proceed with appointed counsel.[1] Second, if the judge determines that the defendant is capable of representing himself and the defendant continues to insist that he does not wish to be represented by appointed counsel, the judge may permit the defendant to proceed pro se with the assistance of standby counsel, as in United States v Garey, No.

---

[1]This assumes of course that there is no constitutional impediment—such as a conflict of interest—to forcing continued representation by the appointed counsel.

05-14631 (11th Cir. 2008).[2]  Theoretically, the judge's third choice is to order the defendant to proceed entirely pro se.

Although I believe the third choice is rarely constitutionally permitted when the defendant unequivocally states that he does not want to proceed pro se,[3] I need not address that issue in this case, because the judge presiding over Jones's trial neither advised Jones of the hazards of self-representation nor inquired into the knowingness of Jones's supposed decision to proceed alone.  There was no colloquy on the record, as there was in Garey, to assure that Jones proceeded with eyes open, aware of the consequences of forgoing his right to counsel at trial; nor was he even provided standby counsel.

On at least four occasions the Supreme Court has indicated that on-the-record warnings of the dangers of self-representation are required for a knowing waiver of counsel.  See Iowa v. Tovar, 541 U.S. 77, 88–89 (2004) ("As to waiver of trial counsel, we have said that before a defendant may be allowed to proceed pro se, he must be warned specifically of the hazards ahead."); id. ("Warnings of

---

[2]In Garey, we noted that the record reflected that the trial judge provided Garey with extensive warnings as to the dangers of self-representation and waiver of counsel.  After being so advised, Garey made clear his preference for self-representation over proceeding with appointed counsel, and the trial court discharged Garey's appointed counsel, but required that he remain as standby counsel.  (Maj. Op. at 27–28.)

[3]In any event, as the majority noted in Garey, the preferred alternative to permitting a defendant to proceed entirely alone is to retain standby counsel.

46

the pitfalls of proceeding to trial without counsel . . . must be 'rigorous[ly]' conveyed." (alteration in original) (quoting Patterson v. Illinois, 487 U.S. 285, 298 (1988))); Patterson, 487 U.S. at 298 ("[R]ecognizing the enormous importance and role that an attorney plays at a criminal trial, we have imposed the most rigorous restrictions on the information that must be conveyed to a defendant, and the procedures that must be observed, before permitting him to waive his right to counsel at trial."); id. at 299 ("[W]e require a more searching or formal inquiry before permitting an accused to waive his right to counsel at trial than we require for a Sixth Amendment waiver during postindictment questioning."); Faretta v. California, 422 U.S. 806, 835 (1975) ("[H]e should be made aware of the dangers and disadvantages of self-representation, so that the record will establish that 'he knows what he is doing and his choice is made with eyes open.'" (quoting Adams v. United States ex rel. McCann, 317 U.S. 269, 279 (1942))); Von Moltke v. Gillies, 332 U.S. 708, 723–24 (1948) (plurality opinion) ("'The constitutional right of an accused to be represented by counsel invokes, of itself, the protection of a trial court, in which the accused—whose life or liberty is at stake—is without counsel. This protecting duty imposes the serious and weighty responsibility upon the trial judge of determining whether there is an intelligent and competent waiver by the accused.' To discharge this duty properly in light of the strong presumption

against waiver of the constitutional right to counsel, a judge must investigate as long and as thoroughly as the circumstances of the case before him demand." (footnote omitted) (citing Johnson v. Zerbst, 304 U.S. 458, 465 (1938))).

Such warnings on the record are required to give full meaning to the right to counsel at trial, and their complete and total absence in this case is, in my view, dispositive.[4] Thus, I believe Jones is entitled to proceed with his habeas petition.

The majority agrees that Jones would be entitled to relief on direct appeal because, on this record, the government would not be able to sustain its burden of proving that Jones knowingly waived his right to counsel. It denies relief here, however, on the grounds that Jones—and not the government—now bears the burden of establishing a violation of his constitutional right to counsel. (Maj. Op. at 36.) I fail to see a distinction in the application of the burdens to the facts of this case. As the majority concedes, the government could not show on the record that Jones knowingly waived the right to counsel as the court never advised Jones of the dangers of self-representation. On that same record, Jones has clearly met his

---

[4]See also United States v. Thomas, 357 F.3d 357, 362 (3d Cir. 2004) ("It is clear from the Supreme Court's decision in Faretta . . . and this court's decision in United States v. Welty, 674 F.2d 185, 188 (3d Cir. 1982), that the district court must undertake an affirmative on-the-record colloquy to explain to the defendant the possibility of waiver and give the defendant 'an awareness of the dangers and disadvantages inherent in defending oneself.'"); United States v. Gewin, 471 F.3d 197, 199 (D.C. Cir. 2006) ("To satisfy Faretta, a trial court must engage the defendant in a 'short discussion on the record' about the dangers and disadvantages of self-representation.").

burden of showing the very same thing: that he was not warned of the dangers of self-representation, that there is no adequate evidence on the record that he otherwise knew and understood those dangers, and thus, that he did not knowingly waive his right to counsel.  I would reverse the judgment of the district court and grant habeas relief.