[DO NOT PUBLISH]

IN THE UNITED STATES COURT OF APPEALS

FOR THE ELEVENTH CIRCUIT

_____

No. 18-10801

_____

D.C. Docket No. 2:17-cv-14117-RLR

JAMES BUHS,

Petitioner - Appellant,

versus

SECRETARY, FLORIDA DEPARTMENT OF CORRECTIONS,

Respondent - Appellee.

_____

Appeal from the United States District Court
for the Southern District of Florida

_____

(April 15, 2020)

Before JORDAN, JILL PRYOR, and WALKER,* Circuit Judges.

PER CURIAM:

_____

* Honorable John M. Walker, Jr., Senior United States Circuit Judge for the Second Circuit, sitting by designation.

James Buhs, a Florida prisoner serving a 25-year sentence following his guilty plea and conviction for morphine trafficking, being a felon in possession of firearms, and the unlawful sale of fireworks in violation of a county ordinance, appeals the district court's denial of his 28 U.S.C. § 2254 habeas corpus petition. In his petition, Mr. Buhs raised one claim of ineffective assistance of counsel. He alleged that his attorney failed to inform him of a prescription defense to the charge of morphine trafficking, and that he would not have pled guilty to that charge—which carried a statutory minimum sentence of 25 years—but for his attorney's deficient advice.

We conclude that the state post-conviction court's adjudication of this claim was based on an unreasonable determination of facts under § 2254(d)(2). We therefore review Mr. Buhs' ineffectiveness claim *de novo*.

As Mr. Buhs acknowledges, the record in this case regarding his counsel's performance has not been developed. Because his allegations remain untested, we remand for the district court to hold an evidentiary hearing and allow Mr. Buhs and the state an opportunity to develop the record.

**I**

After an informant provided a tip that Mr. Buhs was selling fireworks from his home and possessed automatic firearms, detectives investigated and discovered that Mr. Buhs was a convicted felon and did not have fireworks permits. The detectives obtained a warrant to search his home and discovered $4,000 in cash,

2

thousands of pounds of fireworks, chemicals for making fireworks, and a cache of firearms and ammunition.  In an air conditioning vent, they also found a bottle with 215mL of liquid morphine, three prescription bottles containing 90.1 grams of morphine pills, and other prescription bottles containing alprazolam, amotripoline, tizanidine, and cyclobenzaprine.  Mr. Buhs was arrested and, soon after, hired a private defense attorney, Paul Auerbach.

## A

Two weeks after the arrest, Florida charged Mr. Buhs in an information with being a felon in possession of firearms and ammunition in violation of Fla. Stat. § 790.23; trafficking morphine in violation of Fla. Stat. § 893.135(1)(c)(1); unlawful possession of alprazolam, a controlled substance, in violation of Fla. Stat. § 893.13(6)(a); and the unlawful sale of fireworks in violation of a county ordinance.  Mr. Buhs entered into a plea agreement with the state in which he would plead guilty to the charges, refrain from challenging the search warrant, and offer substantial assistance to the police in exchange for a favorable sentence recommendation.  Regardless of how sincere or vigorous his efforts, the state would recommend a sentence reduction only if his cooperation led to an arrest or conviction.

At a change of plea hearing 19 days after his arrest, Mr. Buhs pled no contest to three of the charges, the state having dropped the charge for unlawful possession

3

of alprazolam because he had a valid prescription for the substance. The trial court accepted the plea and released Mr. Buhs on his own recognizance, postponing sentencing for several months to give him an opportunity to satisfy the substantial assistance obligation.

Mr. Buhs later filed a presentencing memorandum seeking a downward departure based on various mitigating circumstances. Regarding the trafficking charge, Mr. Buhs explained that he had kept the morphine in his house as favors for two people, Alan Rosenbaum and Jerry White. He maintained that Mr. Rosenbaum had asked him to store his mother's liquid morphine after she died, as Mr. Rosenbaum had small children and did not want the morphine in his house. He also stated that Mr. White had been prescribed morphine at the VA Hospital and asked Mr. Buhs to hold onto it along with other items that had been salvaged from Mr. White's mobile home after a hurricane. Mr. Buhs appended letters from Mr. Rosenbaum and Mr. White attesting to these facts, as well as a copy of Mr. White's morphine prescription.

At the sentencing hearing, Mr. Auerbach highlighted these circumstances. He asserted that Mr. Buhs was a "hoarder" and that he never sold or used the morphine and did not sell the firearms or use them for illegal activities.

Mr. Buhs testified at the hearing. He explained that he obtained the morphine legally and it had gotten "lost in the shuffle," as neither Mr. White nor Mr.

4

Rosenbaum ever returned to collect their possessions. The state called an ATF agent who testified that, although Mr. Buhs participated diligently in several investigations, his cooperation failed to yield any arrests or convictions.

The trial court determined that, regardless of Mr. Buhs' efforts, it could not sentence him below the 25-year statutory minimum for the morphine trafficking charge because his assistance failed to yield arrests or convictions. It sentenced Mr. Buhs to 15 years' imprisonment on the firearms charge, 25 years' imprisonment on the morphine trafficking charge, and 2 days' imprisonment on the fireworks charge, all running concurrently. The court also imposed a $50,000 fine.

## B

Mr. Buhs subsequently filed a *pro se* motion to withdraw his plea, arguing that he entered the plea involuntarily because Mr. Auerbach misled him. Although he had told Mr. Auerbach how he came into possession of the morphine, Mr. Auerbach nonetheless advised him to plead guilty to all the charges. Mr. Buhs claimed that Mr. Auerbach falsely assured him that the trial court would "set aside" the morphine trafficking charge at sentencing, and had it not been for that erroneous advice, he would have elected to go to trial.

The trial court held a hearing to determine whether Mr. Buhs' plea was knowing and voluntary. The state called Mr. Auerbach to the stand. He discussed his criminal defense experience and his representation of Mr. Buhs. When he was

first hired, Mr. Auerbach was aware that Mr. Buhs had already begun cooperating with the ATF agents.  Mr. Auerbach explained that he had limited his investigation to the search warrant, and when he determined that the warrant was valid, he shifted his defense strategy toward cooperation and sentencing.  According to Mr. Auerbach, "taking the case to trial was never discussed."  He was "prepared to go to trial," if necessary, but the cache of fireworks and weapons might have had "shock value, danger value" in front of the jury.

Focusing on this sentencing strategy, Mr. Auerbach recalled that he went with Mr. Buhs to meet an ATF agent regarding the substantial assistance agreement.  His job in facilitating the agreement, however, was "very limited" and he kept himself in the dark on the details.  He believed that Mr. Buhs' efforts would be fruitful, though he did not articulate any basis for this belief—it was just his "feeling."

Mr. Auerbach also testified about the morphine trafficking charge.  He knew Mr. Buhs had been holding the morphine for acquaintances with valid prescriptions and that he kept the drugs in the air conditioning vent to keep it away from his girlfriend's young son. And though Mr. Auerbach did not see evidence of "trafficking" in the traditional sense, he understood that "the law says with this quantity it's trafficking and that's the end of the discussion."  Mr. Auerbach testified that he did not inform Mr. Buhs that the circumstances of his possession "would somehow amount to [a] legal defense or a reason that the Court will dismiss the

6

charge of trafficking." It was his opinion that the circumstances, combined with the cooperation agreement, could result in a "diminished sentence." He conceded that he likely told Mr. Buhs that he could get his sentence down to three to five years if he pled guilty and provided substantial assistance.[1]

The trial court found that Mr. Buhs' goal had been to cooperate with law enforcement, but that he failed to deliver an arrest or conviction. The court acknowledged that the charges, while serious, did not necessarily warrant 25 years in prison. But the narrow question before the court was whether Mr. Buhs had entered the plea voluntarily. In the court's view, it was not Mr. Buhs' firm expectation of a three- to five-year sentence that motivated his plea but the broader hope of a sentence reduction. Mr. Buhs probably believed he would be found guilty at trial, so he took what he thought was the best route by cooperating and seeking a downward departure. The court found that there was no manifest injustice and that Mr. Buhs had entered the plea knowingly and voluntarily.

Mr. Buhs appealed the denial of his motion to withdraw the plea. Florida's Fourth District Court of Appeal affirmed without a written opinion in 2013. *See Buhs v. State*, 145 So. 3d 107 (Fla. Dist. Ct. App. 2013).

---

[1] We note here—for reasons that will become apparent later—that Mr. Auerbach was never specifically asked and did not testify about whether he had considered or investigated a possible "prescription defense" to the morphine trafficking charge.

7

**C**

In 2014, Mr. Buhs filed a verified post-conviction motion pursuant to Fla. R. Crim. P. 3.850 raising one claim of ineffective assistance of counsel. Mr. Buhs asserted that he had a viable "prescription defense" under Florida law. The prescription defense is an affirmative defense to a drug charge, not only for a valid prescription holder, but also for an agent of the prescription holder. *See* Fla. Stat. §§ 893.04(2)(a), 893.13(6)(a); *McCoy v. State*, 56 So. 3d 37, 39 (Fla. Dist. Ct. App. 2010) ("[C]ontrolled substances may be 'lawfully obtained' by an agent of the prescription holder who can provide 'satisfactory patient information.'"). According to Mr. Buhs, Mr. Auerbach knew that he had obtained the morphine from third parties with valid prescriptions and held the morphine as favors to them, and therefore should have recognized that there was an available defense under Florida law. But Mr. Auerbach failed to advise him that he could proceed to trial and assert the prescription defense, and instead misled him into believing he could have the trafficking charge dismissed at sentencing.

Mr. Buhs argued that he was prejudiced by Mr. Auerbach's deficient performance because he would have proceeded to trial if he had been advised about the prescription defense. The defense was viable, he claimed, because he had the letters from Mr. White and Mr. Rosenbaum, who were willing to testify at trial, as well as a copy of Mr. White's prescription. The maximum sentence for the

8

trafficking charge was also 30 years, and only 5 more years than the 25-year minimum, such that he would be "risking very little" by going to trial.

The state responded that the ineffective assistance of counsel claim required an evidentiary hearing and the state post-conviction court, in agreement, scheduled one. Yet soon thereafter, the state filed a supplemental response asserting that an evidentiary hearing was no longer necessary because it was "clear from the record that [Mr. Auerbach] knew about the prescription defense and made a tactical decision to argue for a downward departure based on substantial assistance to law enforcement."

Mr. Auerbach's tactical decision was "correct," according to the state, because three facts in the record demonstrated that Mr. Buhs would not have had a viable prescription defense. First, the state asserted, Mr. Buhs held the morphine for several years, but "never tried to return it." Second, Mr. Buhs "hid" the morphine in an air conditioning vent, which was a sign of culpability. Finally, the state argued that Mr. Buhs had admitted to a detective that he had used the morphine. The state referred to the following hearsay statement from the detective's unsworn post-arrest narrative, which it appended to its supplemental response: "None of the prescription medications found in the air conditioning vent were prescribed to [Mr.] Buhs. When asked about the hidden prescription medications, [Mr.] Buhs stated, 'I forgot about

9

those.' [Mr.] Buhs advised the hidden medications were 'old' and that he did not use them regularly."

The next day, the post-conviction court cancelled the evidentiary hearing and denied the Rule 3.850 motion without offering Mr. Buhs an opportunity to reply to the state's supplemental response, challenge its factual assertions, or present other evidence. The court incorporated the state's supplemental response by reference and found that Mr. Auerbach "testified that based upon the facts in [Mr. Buhs'] case, he did not believe the prescription defense was a viable option." Because Mr. Buhs possessed the morphine for several years, hid it in an air conditioning vent, and admitted to using it, Mr. Auerbach had decided that the best course of action was to mitigate the sentence through the substantial assistance agreement. This decision, according to the state post-conviction court, was not objectively unreasonable. Moreover, Mr. Buhs was not prejudiced because he had "acknowledge[d] in his motion that counsel had advised him of the prescription defense" and could not "go behind his plea and raise issues that were known to him at the time he entered the plea."[2]

---

[2] We note here that Mr. Buhs declared under oath in his verified Rule 3.850 motion that Mr. Auerbach did *not* advise him of the prescription defense, and we have not found any acknowledgment to the contrary in any other motion or filing.

Mr. Buhs appealed the denial of his Rule 3.850 motion. Florida's Fourth District Court of Appeal affirmed without a written opinion. *See Buhs v. State*, 229 So. 3d 1241 (Fla. Dist. Ct. App. 2017).

**D**

Mr. Buhs filed the present § 2254 habeas petition in federal court. A magistrate judge ordered an evidentiary hearing, agreeing with Mr. Buhs that the state post-conviction court had erred when it determined that Mr. Auerbach actually testified he did not believe the prescription defense was viable, that Mr. Buhs admitted to using the morphine, and that Mr. Buhs conceded that he was advised about the prescription defense. The magistrate judge concluded that the record was "ambiguous" as to whether Mr. Auerbach considered the prescription defense. Mr. Buhs therefore overcame the deference owed to the state court adjudication. And because he had attempted to develop the record in the state court proceedings, it was permissible to develop the record further in federal court.

Shortly before the evidentiary hearing, however, the state moved for reconsideration and the magistrate judge cancelled the hearing based on the state's assertion that the habeas petition was untimely. Although the magistrate judge did not immediately rule on timeliness, she concluded that the argument was strong enough "to warrant exploring that issue further before holding the evidentiary hearing." She stated that "[i]f after thorough briefing this [c]ourt again sees a

11

sufficient basis for timeliness to proceed to the merits, then this [c]ourt will re-set the evidentiary hearing at that time."

The magistrate judge subsequently issued a report and recommendation. She concluded that Mr. Buhs' habeas corpus petition was timely and not precluded by any other procedural bar, but nonetheless recommended that the district court deny Mr. Buhs' habeas corpus petition on the merits—without the promised evidentiary hearing—because the state court's factual findings regarding Mr. Auerbach's performance were entitled to deference and Mr. Buhs could not demonstrate prejudice. Over Mr. Buhs' objection, the district court adopted the report and recommendation, and it denied his habeas petition.

## II

The district court's denial of Mr. Buhs' habeas corpus petition is subject to plenary review. *See Peterka v. McNeil*, 532 F.3d 1199, 1200 (11th Cir. 2008). Because his petition is governed by the Antiterrorism and Effective Death Penalty Act ("AEDPA"), Pub. L. No. 104–132, 110 Stat. 1214 (1996), Mr. Buhs can obtain relief only if the state court adjudication of his claim was "contrary to, or involved an unreasonable application of, clearly established Federal law, as determined by the Supreme Court of the United States," § 2254(d)(1), or was "based on an unreasonable determination of the facts in light of the evidence presented in the State court proceeding," § 2254(d)(2). Only § 2254(d)(2) is at issue in this case.

12

When a state court's adjudication of a habeas claim is based on an unreasonable determination of the facts in light of the state court record, we are "not bound to defer to the unreasonably-found facts or to the legal conclusions that flow from them." *Jones v. Walker*, 540 F.3d 1277, 1288 n.5 (11th Cir. 2008)*.* In such instances, we review the underlying habeas claim *de novo*. *See id.*

Mr. Buhs raised one claim of ineffective assistance of counsel under the Sixth Amendment pursuant to *Strickland v. Washington*, 466 U.S. 668 (1984). To satisfy the first prong of *Strickland*, Mr. Buhs must show that Mr. Auerbach's representation fell outside the wide range of reasonable professional assistance. *See id.* at 689. When an attorney makes a tactical decision following a thorough investigation of the law and the facts, that choice is generally unassailable. *See Wiggins v. Smith,* 539 U.S. 510, 521–22 (2003).

Where the performance prong of *Strickland* is concerned, habeas review is "doubly deferential." *See Yarborough v. Gentry*, 540 U.S. 1, 6 (2003) (explaining that judicial review of a defense attorney's performance is highly deferential, "and doubly deferential when it is conducted through the lens of federal habeas"). Notwithstanding this double deference for performance, however, a court "may not indulge 'post hoc rationalization' for counsel's decisionmaking that contradicts the available evidence of counsel's actions." *Harrington v. Richter*, 562 U.S. 86, 109 (2011) (quoting *Wiggins*, 539 U.S. at 526–27). *See also Montgomery v. Uchtman*,

13

426 F.3d 905, 914 (7th Cir. 2005) (explaining that a federal court will not accept a state court's description of a strategic decision that is "so disconnected from the picture painted by the facts in the record that it could only be explained as a *post hoc* rationalization of counsel's conduct").

The second prong of *Strickland* requires Mr. Buhs to show there is a reasonable probability that, but for his counsel's deficient performance, the outcome of the proceedings would have been different. *See* 466 U.S. at 694. Because Mr. Buhs claims the deficient performance deprived him of a trial by causing him to plead guilty, he must demonstrate "a reasonable probability that, but for counsel's errors, he would not have pleaded guilty and would have insisted on going to trial." *Hill v. Lockhart*, 474 U.S. 52, 59 (1985)).

The Fourth District summarily affirmed the denial of Mr. Buhs' ineffective assistance of counsel claim, so we must "look through" that summary affirmance to the state post-conviction court's decision—"the last related state-court decision that [did] provide a relevant rationale." *Wilson v. Sellers*, 138 S. Ct. 1188, 1192 (2018). After a thorough review of that decision and the record, we conclude that the denial of Mr. Buhs' claim was based on an unreasonable determination of facts in light of the evidence in the state court record.

14

**A**

With respect to the *Strickland* performance prong, the state post-conviction court rendered its decision based on a finding that Mr. Auerbach considered "utilizing the prescription defense [but] made the tactical decision to argue for a downward departure based on substantial assistance to law enforcement." That finding is critical because if Mr. Auerbach had made an informed decision to disregard the prescription defense, then the decision would be afforded substantial deference. *See, e.g., Strickland*, 466 U.S. at 681 ("[B]ecause the adversary system requires deference to counsel's informed decisions, strategic choices must be respected in these circumstances if they are based on professional judgment."). But the post-conviction court's finding that Mr. Auerbach made an informed decision is based on two subsidiary findings, neither of which has any support in the record.

First and most importantly, the post-conviction court found that Mr. Auerbach "testified that based upon the facts in [Mr. Buhs'] case, he did not believe the prescription drug defense was a viable option." That finding was plainly and clearly erroneous. Mr. Auerbach never testified that he considered or evaluated the prescription defense for the morphine trafficking charge. He was never asked about it, never said anything about it, and certainly did not state whether he believed it was a viable defense under the circumstances.

15

Second, the post-conviction court found that Mr. Auerbach "conducted a thorough investigation of the law and facts relevant to plausible options." Again, this finding is unsupported. There is no direct evidence that Mr. Auerbach investigated, researched, or considered the prescription defense for the morphine trafficking charge.

The state post-conviction court's reliance on these two unsupported findings severely undermines the deference normally owed under § 2254(d)(2). *See Wiggins*, 539 U.S. at 528 (where a state court based its conclusion on a clear factual error, even a "partial reliance" on the erroneous finding can demonstrate the unreasonableness of the state court's decision). As we have explained, a finding constitutes an unreasonable determination of facts if it has no support in the record. *See Bui v. Haley*, 321 F.3d 1304, 1315 (11th Cir. 2003).

The magistrate judge nevertheless concluded that the state post-conviction court could have drawn inferences about Mr. Auerbach's strategy from the "overall" record. We disagree.[3]

The only time Mr. Auerbach discussed his representation of Mr. Buhs was when he testified at the plea withdrawal hearing. That hearing addressed a separate

---

[3] Relying on our precedent at the time, the magistrate judge declined to "look through" the Fourth District's summary affirmance to the state post-conviction court's reasoned decision. As the Supreme Court subsequently made clear in *Wilson v. Sellers*, 138 S. Ct. 1188, 1192 (2018), however, the magistrate judge was required to analyze the last reasoned decision and not the summary affirmance.

16

and narrower question—whether Mr. Buhs' plea was involuntary. Mr. Buhs' contention was that Mr. Auerbach misled him into taking the plea by telling him that the trial court would dismiss the morphine charge at the sentencing stage such that he would face only three to five years in prison if he pled guilty. Mr. Buhs had not yet asserted an ineffective assistance of counsel claim based on the prescription defense, and the matter never came up at the hearing.

Assuming it would have been reasonable for the state post-conviction court to draw inferences from the plea withdrawal hearing, Mr. Auerbach's testimony tends to show the opposite—that he never considered, researched, or investigated facts or law related to the prescription defense. The most revealing testimony is from the following exchange that Mr. Auerbach had with the prosecutor at the plea withdrawal hearing:

> Q. [I]n this case did you come to the point where you reached a . . . time when you were going to negotiate with the State for a resolution of the case?
>
> A. The initial problem I had was getting the application for the search warrant.
>
> Q. Okay
>
> A. That was critical in my thinking because if the search warrant wasn't good, then the case fell apart. And once I had the warrant I read it and reread it and studied it, and that was the issue. And ultimately it was resolved in my own mind that the warrant was good, at which point I kind of, like, shifted my attitude and, Let's see if we can talk.

This colloquy may have been the best window into Mr. Auerbach's overall trial strategy given the limited scope of the hearing where the exchange took place. The state asked Mr. Auerbach about the point at which he decided to shift to a sentencing strategy. Had Mr. Auerbach considered other defense strategies first, he likely would have raised them in response to this question. But he did not mention the prescription defense, and his answer suggests that the *only* strategy he considered was challenging the search warrant. The search warrant was the "initial" problem, and upon realizing that the warrant was valid, he shifted to plea negotiations and sentencing strategy. There does not seem to have been any intermediate analysis in which he considered any affirmative defenses—the search warrant was "the issue."

At another point in the hearing, Mr. Auerbach testified that he believed the trafficking charges could have been dismissed "if I could have won on the search warrant," which again shows that he believed challenging the warrant was the only plausible defense. Consistent with that belief, he testified that "taking the case to trial was never discussed." Had Mr. Auerbach considered affirmative defenses, he and Mr. Buhs likely would have discussed going to trial.

There is, of course, the possibility that Mr. Auerbach did not discuss going to trial with Mr. Buhs because he researched the prescription defense, determined it was highly implausible based on the facts, and then decided it was not worth discussing. Along those lines, the state argues on appeal that the state post-

18

conviction court could have inferred that Mr. Auerbach "saw no defense of sufficient merit or viability that was worth pursuing at the guilt-determination phase." But there is no evidence that this was Mr. Auerbach's thinking, at least not without some evidence that he even considered the prescription defense. The inference advanced by the state would require presuming *both* that Mr. Auerbach knew about the prescription defense *and* that he knew that it extended to agents of prescription holders. There is evidence that he did not.

The state, citing to the magistrate judge's report, suggests that Mr. Auerbach got the prosecutor to drop the charge for unlawful possession of alprazolam because Mr. Buhs himself had a valid prescription, which would tend to show that Mr. Auerbach was aware of a prescription defense generally. But there is no evidence for the magistrate judge's assumption that it was Mr. Auerbach who got the state to drop the alprazolam charge. At the plea withdrawal hearing, Mr. Buhs testified that he gave the prescription to the state and that as result the state dropped the charge. In any event, the state's contention does not show that Mr. Auerbach knew that the prescription defense extended to agents of valid prescription holders or, for that matter, that it could apply to a Florida trafficking charge, as opposed to just an unlawful possession charge. Indeed, Mr. Auerbach's testimony and actions suggest he did not recognize the breadth of the defense.

19

Mr. Auerbach said that he knew Mr. Buhs obtained the morphine from Mr. Rosenbaum and Mr. White, who had valid prescriptions, and acknowledged that the drugs "were legal at one time." Yet there is no evidence that he asked the state to drop the morphine trafficking charge along with the charge for unlawful possession of alprazolam. That would have been an obvious strategy had he believed that the prescription defense could apply to both charges. Further, Mr. Auerbach testified that, while "as a lawyer, as a citizen" he did not believe that the circumstances of Mr. Buhs' possession constituted "trafficking," he understood that "the law says with this quantity it's trafficking *and that's the end of the discussion*." (emphasis added). In other words, he seems to have believed that there was no exception to the trafficking charge, even for someone who claims to have possessed the morphine on behalf of a valid prescription holder.

Finally, if Mr. Auerbach had researched the prescription defense—and then compared that defense to the sentencing strategy in order to make a tactical choice— then he would have needed to assess the chances that the sentencing strategy would work. That would have required Mr. Auerbach to verify whether Mr. Buhs could in fact provide substantial assistance to law enforcement. As Mr. Auerbach acknowledged, the substantial assistance was the "key" to sentencing because it would allow the trial court to depart downward. Yet Mr. Auerbach testified that he was only "under the impression" that Mr. Buhs could provide substantial assistance

and he stated, "I didn't know – I don't know but that was my feeling." He also explained that his job in facilitating the cooperation agreement was "very limited" and he kept himself in the dark regarding the details. That Mr. Auerbach took little interest in Mr. Buhs' chances of success on cooperation strategy strongly suggests that he believed pleading guilty was the only viable strategy, aside from challenging the warrant. That in turn strongly indicates that he did not investigate or consider the prescription defense for Mr. Buhs.

## B

A defendant's ability to make informed decisions is central to the *Strickland* prejudice prong in the plea context. *See, e.g., Lee v. United States*, 137 S. Ct. 1958, 1965 (2017). *See also Burt v. Titlow*, 571 U.S. 12, 25 (2013) (Sotomayor, J., concurring) (explaining that in the plea context, counsel must conduct a reasonable investigation and "then offer his informed opinion as to what plea should be entered") (quoting *Von Moltke v. Gillies*, 332 U.S. 708 (1948)). The state post-conviction court's conclusion about prejudice was predicated on its finding that Mr. Buhs "acknowledged" in a filing that Mr. Auerbach had advised him about the prescription defense. This finding was also clearly erroneous.

The state post-conviction court did not refer to any specific filing or motion to support this proposition and, like the magistrate judge, we see no such acknowledgement from Mr. Buhs in the record. The state argues that the proposition

21

can be inferred from any one of three motions. In each of the three motions to which the state refers, however, Mr. Buhs merely stated that Mr. Auerbach advised him that the trial court could dismiss the trafficking charge *at sentencing* based on the circumstances of his possession. This is not a concession that Mr. Auerbach advised him about the prescription defense at the guilt-determination phase. Again, the prescription defense is an affirmative defense to trafficking, which if proven would have established Mr. Buhs' innocence.

We further note that there is evidence that Mr. Auerbach did *not* advise Mr. Buhs about the prescription defense. For one, Mr. Buhs declared this fact under oath in his verified Rule 3.850 motion. *See Valle v. State*, 705 So. 2d 1331, 1333 (Fla. 1997) (factual allegations in a verified Rule 3.850 motion are sufficient as a matter of law to withstand summary denial and warrant an evidentiary hearing, so long as the allegations are not conclusively rebutted by the record). *Cf. Josendis v. Wall to Wall Residence Repairs, Inc.*, 662 F.3d 1292, 1305 n.23 (11th Cir. 2011) (verified pleadings may be treated as affidavits for purposes of summary judgment where the allegations are made based on personal knowledge, set out facts that would be admissible in evidence, and show that the declarant is competent to testify on the matters stated) (citing *United States v. Four Parcels of Real Prop.*, 941 F.2d 1428, 1444 n. 35 (11th Cir. 1991)).

22

In addition, when asked whether he told "Mr. Buhs at any point that [the] scenario for how he came into possession with the drugs would somehow amount to [a] legal defense or a reason that the Court will dismiss the charge of trafficking," Mr. Auerbach answered "[n]o." He "couldn't have" because the charges "could have been dismissed if I could have won on the search warrant. But we discussed that and I felt that that was a useless task." And, again, Mr. Auerbach testified that "taking the case to trial was never discussed." These statements paint a relatively clear picture that Mr. Auerbach advised Mr. Buhs about two options—challenging the search warrant or pleading guilty and seeking a downward departure based upon substantial assistance at sentencing.

As noted, the state post-conviction court ultimately refused to hold an evidentiary hearing or receive other evidence from Mr. Buhs. The state and the post-conviction court initially (and correctly) recognized that it was necessary to ascertain facts about whether Mr. Auerbach had investigated the prescription defense and made a tactical decision to forgo it. But the state post-conviction court cancelled the evidentiary hearing and ruled on the Rule 3.850 motion only one day after the state filed its supplemental response, without affording Mr. Buhs any opportunity to respond or present additional evidence. Had the state post-conviction court held an evidentiary hearing, we might be faced with a different case.

23

## III

Because we find that the state court's ruling was based on an unreasonable determination of facts, we vacate the district court's contrary finding and its denial of Mr. Buhs' petition. *See Burgess v. Comm'r, Ala. Dep't of Corr.*, 723 F.3d 1308, 1319 (11th Cir. 2013). That opens the door for us to review the merits of Mr. Buhs' ineffectiveness claim *de novo*. *See Jones*, 540 F.3d at 1288 n.5.

Conducting plenary review, we are reluctant to rule on Mr. Buhs' claim "in the first instance because many of the factual allegations in [Mr. Buhs'] federal petition remain untested." *Williams v. Alabama*, 791 F.3d 1267, 1276 (11th Cir. 2015). Mr. Buhs "has never been afforded an opportunity to develop [his claimed] factual basis in the crucible of an evidentiary hearing—nor, just as importantly, has the State had the opportunity to challenge them in an adversarial hearing." *Pope v. Sec'y Dep't of Corr.*, 680 F.3d 1271, 1294 (11th Cir. 2012). We therefore remand for the district court to hold an evidentiary hearing before ruling on the merits of the habeas petition.

In so holding, we conclude that Mr. Buhs satisfies the prerequisite conditions for a federal evidentiary hearing. First, as the magistrate judge found—*see* D.E. 14 at 5—Mr. Buhs attempted to develop the record in state court and was prevented from doing so through no fault of his own. *See* § 2254(e)(2); *Williams*, 791 F.3d at 1276 (explaining that AEDPA bars a district court from holding an evidentiary

24

hearing if the petitioner "failed to develop the factual basis of a claim in State court proceedings" due to a "lack of diligence, or some greater fault, attributable to the prisoner or the prisoner's counsel") (internal quotations marks and alterations omitted). The state does not challenge this finding on appeal, and it is clear that Mr. Buhs requested (and was denied) an evidentiary hearing in state court. Second, Mr. Buhs alleged facts in his verified petition that, "if true, would entitle him to federal habeas relief." *Schriro v. Landrigan*, 550 U.S. 465, 474 (2007). Third, and contrary to the state's arguments, the record does not refute or undermine Mr. Buhs' allegations such that an evidentiary hearing would be unwarranted. *See id.* (explaining that an evidentiary hearing is not warranted if the existing state record "refutes the applicant's factual allegations or otherwise precludes habeas relief").

## A

Mr. Buhs alleged that before he pled guilty, Mr. Auerbach failed to advise him of an available prescription defense, even though Mr. Auerbach knew about the facts that would have made the defense viable. If true, these allegations could establish that Mr. Auerbach performed deficiently under *Strickland*. *See, e.g., Wofford v. Wainwright*, 748 F.2d 1505, 1508 (11th Cir. 1984) (counsel has a duty to "provide his client with an understanding of the law in relation to the facts, so that the accused may make an informed and conscious choice between accepting the prosecution's offer and going to trial").

25

Mr. Buhs' verified factual allegations have support in the record. As explained above, the testimony at the plea withdrawal hearing tends to show that Mr. Auerbach limited his investigation to challenging the search warrant and that he may not have realized that there was an exception to a trafficking charge for an agent of a valid prescription holder. *See Hinton v. Alabama*, 571 U.S. 263, 274 (2014) ("An attorney's ignorance of a point of law that is fundamental to his case combined with his failure to perform basic research on that point is a quintessential example of unreasonable performance under *Strickland*.").

The record also suggests that the defense was viable, such that it would have been incumbent upon Mr. Auerbach to conduct appropriate legal and factual research before abandoning the strategy or deciding not to advise Mr. Buhs about the defense. *See Strickland*, 466 U.S. at 691 ("[C]ounsel has a duty to make reasonable investigations."). Mr. Buhs alleged that he held the morphine on behalf of third parties with valid prescriptions, and he provided letters from the prescription holders attesting to the facts. He also presented one of their prescriptions and stated that the witnesses were willing to testify. Mr. Auerbach certainly knew about these facts and even acknowledged to the state court that the drugs were "legal at one time." That Mr. Auerbach knew the drugs were legal at one point should have prompted him to conduct further legal and factual research into the issue, until he was reasonably satisfied that the defense was not viable.

26

If Mr. Auerbach did not investigate the prescription defense because of neglect or oversight, then it is possible that his performance was deficient. The *Strickland* inquiry is an objective one, but an attorney's "inattention," as opposed to strategic judgment, can "underscore[ ] the unreasonableness of counsel's conduct." *Wiggins*, 539 U.S. at 526. *See also United States v. Mooney*, 497 F.3d 397, 404 (4th Cir. 2007) (holding that an attorney performed deficiently when he advised a defendant to plead guilty but, because of a failure to conduct reasonable legal research, did not advise the defendant of a plausible affirmative defense).

Applying *de novo* review, however, we cannot answer these questions confidently. There is no direct evidence regarding whether Mr. Auerbach considered or investigated a prescription defense with respect to the morphine that Mr. Buhs received from others, and the record is underdeveloped as to what relevant, contemporaneous facts Mr. Auerbach knew or could have known at the time. There is some evidence—from the verified Rule 3.850 motion—that Mr. Auerbach did not advise Mr. Buhs about the prescription defense. But that evidence remains untested. It is therefore necessary to remand for an evidentiary hearing.

The state argues that a prescription defense "would not have flown well at trial" and that Mr. Auerbach, "an attorney with fifty-five years of experience would have been well aware of this." The state predicates this argument on three factual suppositions, which the state post-conviction court adopted in its denial of Mr. Buhs'

27

Rule 3.850 motion.  First, according to the state, Mr. Buhs held the morphine for several years, but "never tried to return it."  Second, Mr. Buhs "hid" the morphine in a vent, signifying his culpability.  Third, the state argues, Mr. Buhs admitted to using the morphine.

As a threshold matter, the state does not challenge the magistrate judge's finding that the defense was generally "available" to Mr. Buhs, even assuming these three facts were true.  The magistrate judge did not see any reason why the "prolonged and ongoing duration" of the possession and "the use of the air-conditioning vent hiding place" would *prevent* Mr. Buhs from asserting the defense as a matter of law.  Further, Florida law permits giving a jury instruction on the prescription defense even if there is evidence that the defendant used the medication for an illegal purpose.  *See Glovacz v. State*, 60 So. 3d 423, 424 (Fla. Dist. Ct. App. 2011).  We agree with the magistrate judge that there was no legal bar preventing Mr. Buhs from presenting a prescription defense to a jury.

Nor do these three facts demonstrate that the prescription defense was so unlikely to succeed that Mr. Auerbach was relieved of any duty to investigate further or to advise Mr. Buhs about the defense.  It is not beyond question that a jury would find the defense credible, as Mr. Buhs had supporting evidence and apparently two witnesses willing to take the stand.  In addition, as discussed earlier, there is evidence that Mr. Auerbach was unaware of the breadth of the prescription defense, so he may

28

not have even factored these circumstances into his strategic thinking and, if so, his performance may have been objectively deficient.

Most fundamentally, however, we disagree that the record establishes these three facts as the state characterizes them. Though it is true that Mr. Buhs held the morphine for a long time, there is not conclusive evidence that he "never tried to return" it. On the contrary, Mr. Buhs explained that the prescription holders never came back to collect their morphine. One could conclude that Mr. Buhs intended to return the morphine but never had the opportunity, or that it had gotten "lost in the shuffle," as he purportedly explained to the arresting detective. Moreover, there is no conclusive evidence that Mr. Buhs tried to "hide" the morphine in a nefarious sense as the state suggests. There are indications that Mr. Buhs was a hoarder and that he was trying to keep the morphine away from his girlfriend's young son, such that one could reasonably conclude that the manner of storage was innocuous. Finally, the arresting officer's written narrative, which purportedly established that Mr. Buhs used the morphine, was untested hearsay that would not have been admissible at trial, and the state did not offer an affidavit by the officer. *See Burgess v. State*, 831 So. 2d 137, 140 (Fla. 2002) (explaining that "information contained in police reports is ordinarily considered hearsay and inadmissible in an adversary criminal proceeding," and does not fall under any recognized exception to hearsay). The officer's narrative, in any event, is ambiguous. When Mr. Buhs supposedly

29

informed officers that the "medications were 'old' and that he did not use them regularly," he may have meant he did not regularly use *his* prescription alprazolam, which was discovered alongside the morphine. Other than the officer's somewhat vague, after-the-fact report, there is no evidence in the record that Mr. Buhs used the morphine of his acquaintances.

The state's three purported facts are therefore tenuous at best and certainly not fatal to Mr. Buhs' claim in light of the evidence in the record supporting the prescription defense. In any event, these potentially important facts—as with others in the case—have not been established at an evidentiary hearing. Mr. Buhs has not had an opportunity to further explain how he came into possession of the drugs, why he stored them as he did, or whether he used them. A court may find his explanations credible in the course of a hearing, or it may not. Just as importantly, Mr. Buhs and the state have not had the opportunity to question Mr. Auerbach about what he knew at the time regarding the circumstances of the morphine possession, whether that knowledge factored into his strategy, and whether he communicated his analysis to Mr. Buhs.

**B**

The magistrate judge concluded that even if Mr. Auerbach did not advise Mr. Buhs of the option to take the prescription defense to the jury, Mr. Buhs could not establish *Strickland* prejudice. According to the magistrate judge, the defense was

30

not "air tight" and success at trial was "far from assured."  By going to trial,

moreover, Mr. Buhs risked putting adverse evidence in front of the jury, such as the

large cache of fireworks, opiates, and weapons.  A guilty verdict on all three charges

may have even resulted in a lengthier sentence than what he received.  By

comparison, his plea deal and sentencing strategy gave him a real chance of a

sentence substantially below the mandatory minimum.

Normally, under *Strickland* a defendant must demonstrate prejudice by

showing "a reasonable probability that, but for counsel's unprofessional errors, the

result of the proceeding would have been different." *Roe v. Flores–Ortega*, 528 U.S.

470, 482 (2000) (quoting *Strickland*, 466 U.S. at 694).  That predictive analysis—

which the magistrate judge conducted here—is not dispositive in Mr. Buhs' case.  In

the context of a guilty plea, the petitioner must show that his counsel's advice was

deficient and that, "but for counsel's errors, he would not have pleaded guilty and

would have insisted on going to trial." *Hill*, 474 U.S. at 58–59.  And in this scenario,

the question is not whether there is a reasonable probability that the defendant would

have been acquitted at trial.  As the Supreme Court recently explained in *Lee*, 137

S. Ct. at 1965:

> When a defendant alleges his counsel's deficient performance led him
> to accept a guilty plea rather than go to trial, we do not ask whether,
> had he gone to trial, the result of that trial 'would have been different'
> than the result of the plea bargain . . . We instead consider whether the

31

defendant was prejudiced by the 'denial of the entire judicial proceeding . . . to which he had a right.'"

(quoting *Flores–Ortega*, 528 U.S. at 483).

In *Lee*, the petitioner's attorney advised him that he would not face mandatory deportation if he pleaded guilty to a drug distribution charge. *See id.* at 1963. That advice was incorrect; the petitioner pled guilty and was ordered deported as mandated by the Immigration and Nationality Act. *See id.* All parties agreed that the attorney's performance was therefore deficient under *Strickland. See id.* at 1964.

The Supreme Court concluded that the petitioner also demonstrated *Strickland* prejudice because he showed a reasonable probability that but for his attorney's erroneous advice he would have proceeded to trial, even though he did not show that he necessarily would have been better off by going to trial. *See id.* at 1967–68. Although the petitioner's prospects of acquittal were "grim," he alleged that "avoiding deportation was the determinative factor for him." *Id.* at 1965–67. That allegation was supported by contemporaneous evidence, particularly the multiple times he asked his attorney whether he would be deported if he pled guilty and his statement to the judge at the plea colloquy that deportation would have affected his plea. *See id.* at 1967–68. The decision to go to trial also would not have been "irrational" in retrospect, even though his prospects were poor. *See id.* at 1968. At trial his chances of deportation were *almost* certain, but his guilty plea *guaranteed* deportation. *See id.* at 1968–69. Because his attorney's mistake caused him not to

32

understand the consequences of his plea, he was prejudiced by the denial of his right to a trial. *See id.* at 1965.

Like the petitioner in *Lee*, Mr. Buhs may not have understood the consequences of his guilty plea due to his counsel's allegedly deficient performance. Assuming Mr. Auerbach did not advise him about a plausible affirmative defense, then Mr. Buhs would not have known he was pleading guilty to a charge for which he may have in fact been innocent. And, as with the petitioner in *Lee*, there is some contemporaneous evidence—and not merely "*post hoc* assertions," *id.* at 1967—that Mr. Buhs would have elected to go to trial but for the deficient advice. In his motion to withdraw his plea, Mr. Buhs stated that he would have gone to trial had he known it was not possible for the trial court to dismiss the morphine trafficking charge at sentencing.

We also conclude, at this stage and in light of the existing record, that it would not have been irrational for Mr. Buhs to put the defense to the jury. *See id.* at 1968–69. *See also Padilla v. Kentucky*, 559 U.S. 356, 372 (2010) (explaining that "a petitioner must convince the court that a decision to reject the plea bargain would have been rational under the circumstances"). It is true that a trial would allow the introduction of adverse evidence with some "shock value." It is also true that Mr. Buhs had already been pursuing a cooperation strategy, even before he hired Mr. Auerbach, and there may have been some logic to that approach at the time. But the

33

trafficking charge carried a 25-year mandatory minimum and a 30-year maximum, and the only way for Mr. Buhs to get a sentence beneath the minimum was to provide substantial assistance that led to an arrest or conviction.  If Mr. Buhs knew of the prescription defense, he could have reasonably stopped pursuing the cooperation strategy, particularly if he did not have valuable information that could lead to an arrest or conviction.  We do not definitively opine on these matters, as the district court will be in a better position to sort them out after an evidentiary hearing.

At this point, Mr. Buhs has sufficiently alleged *Strickland* prejudice, as elucidated by *Hill* and *Lee*, and should be able to develop the record further at an evidentiary hearing.  As some of our sister circuits have recognized, *Lee* "[e]mphasiz[ed] the need for a case-by-case examination of the totality of the evidence." *Young v. Spinner*, 873 F.3d 282, 285 (5th Cir. 2017). *See also Neill v. United States*, 937 F.3d 671, 678 (6th Cir. 2019) (the *Lee* inquiry requires that we "consider several factors specific to that defendant"); *United States v. Aguiar*, 894 F.3d 351, 361 (D.C. Cir. 2018) (remanding for an evidentiary hearing where "the record is quite sketchy regarding plea discussions" and "the motion and the files and records of the case do not conclusively show the petitioner was advised of the consequences of rejecting the plea offer") (internal quotation marks and alterations omitted).

34

## IV

We vacate the district court's denial of Mr. Buhs' habeas corpus petition, and remand for an evidentiary hearing and *de novo* review of Mr. Buhs' ineffective assistance of counsel claim consistent with this opinion.

**VACATED AND REMANDED.**